UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| KRISTY MITCHELL, individually and as mother and next friend of NEVAEH OSORIO,<br><br>     Plaintiffs,<br><br>v.<br><br>DES MOINES INDEPENDENT COMMUNITY SCHOOL DISTRICT and TIMOTHY DOWLER,<br><br>     Defendants. | Case No.: 4:20-cv-00109-SMR-HCA<br><br>**APPENDIX IN RESISTANCE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

**Table of Contents**

**Exhibit**                                                                                                    **Page**

1.    Nevaeh Osorio Deposition Excerpts ............................................................................. 3

2.    Katie H. Deposition Excerpts ..................................................................................... 17

3.    F.W. Deposition Excerpts........................................................................................... 23

4.    M.W. Deposition Excerpts ......................................................................................... 30

5.    Timothy Dowler Deposition Excerpts ........................................................................ 34

6.    Craig A. Weatherall Expert Report............................................................................. 37

7.    Roosevelt High School Student Handbook Excerpts.................................................. 41

8.    Craig Weatherall Deposition Entire............................................................................ 44

Respectfully submitted,


*/s/ Jeffrey M. Lipman*
Jeffrey M. Lipman     AT0004738
LIPMAN LAW FIRM, P.C.


**PApp 1**

1454 30th St. Suite 205
West Des Moines, IA 50266
Telephone: (515) 276-3411
Facsimile: (515) 276-3736
Email: jeff@lipmanlawfirm.com

Alison F. Kanne
Wadro & Associates, P.C.
2501 Grand Avenue, Suite B
Des Moines, IA 50312
T: (515) 281-1475
F: (515) 281-1474
Email: akanne@2501grand.com

**ATTORNEYS FOR PLAINTIFFS**

Page 1

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

KRISTY MITCHELL,            )
individually and as         )
mother an next friend       ) Case No.
of NEVAEH OSORIO,           ) 4:20-cv-00109-
                            ) SMR-HCA
            Plaintiffs,     )
                            )
vs.                         ) VIDEOCONFERENCE
                            )
DES MOINES INDEPENDENT      ) DEPOSITION OF
COMMUNITY SCHOOL DISTRICT   )
and TIMOTHY DOWLER,         ) NEVAEH OSORIO
                            )
            Defendants.     )
_____    )

THE VIDEOCONFERENCE DEPOSITION OF
NEVAEH OSORIO, taken remotely before
Gale Sweeney Christensen, Certified Shorthand
Reporter, Registered Professional Reporter,
and Notary Public of the State of Iowa,
commencing at 9:06 a.m., August 4, 2020, at
505 Fifth Avenue, Suite 320 Insurance
Exchange Building, Des Moines, Iowa.

Job No. CS4179997

Reported by:  Gale Sweeney Christensen,
              CSR, RPR

PApp 3                                      Ex. 1

Page 10

Q. Oh, from like kindergarten to seventh grade?
A. Yeah.
Q. All right. And where did you live when you went to Central Decatur?
A. In Leon.
Q. What town? Okay. And then did you guys move to the Des Moines area?
A. Yes.
Q. When you were at Merrill, did you participate in any sports?
A. Yes.
Q. What did you participate in?
A. Volleyball, basketball, softball, soccer, and track.
Q. And your soccer were you on a club team?
A. Just a school team.
Q. They had a soccer team in middle school?
A. Yeah.
Q. Then when you were at Roosevelt, did you participate in any sports?
A. Yes.
Q. What sports?
A. Basketball and softball.
Q. At Ankeny did you participate in any

Page 11

sports?
A. No.
Q. And why not?
A. My concussion.
Q. And what doctor told you that you had a concussion that you couldn't participate in sports?
A. I am not sure what his name was. He was a sports medicine doctor in Des Moines.
Q. So the sports medicine doctor that you went to, I think his name was Chad Carlson; does that sound right?
A. Yeah.
Q. At Stadia Sports Medicine Clinic?
A. Yeah.
Q. And he specifically told you that you couldn't participate in sports because you had a concussion?
A. Yeah. I wasn't cleared.
Q. And the last time I have you seeing him was in November of 2019. Have you been back to see him since November of 2019?
A. No.
Q. Has any other doctor told you that you can't participate in sports?

Page 12

A. No.
Q. Have you been back to see if you're cleared to participate in sports?
A. No.
Q. So you really don't know; correct?
A. Correct.
Q. So you didn't attend school in Indiana yet; correct?
A. Correct.
Q. And are you enrolled in school?
A. No, we have to wait until Wednesday.
Q. And why?
A. We are getting a guardianship done so we can have the papers to get me enrolled.
Q. And are you going to enroll in a high school in Indiana?
A. Yes.
Q. Do you know the name of the high school?
A. East Central.
Q. And I'm sorry. What's the name of that town again?
A. Bright.
Q. Can you spell that for us.
A. B-r-i-g-h-t.
Q. And do you know, are they going to do

Page 13

online, or are they going to do some classroom participation?
A. I am going to do online.
Q. Do they have an action to do -- go to school too?
A. Yes.
Q. Is it full-time go to school or part-time?
A. I am not sure.
Q. What type of student were you in Ankeny High School?
A. What do you mean?
Q. Like grades, did you get As, Bs, Cs, Ds, Fs?
A. At the beginning of the year, my grades were pretty good, like Bs and Cs.
Q. And then what happened?
A. The fight happened, and I got my concussion and whiplash and everything, and I just, like, didn't go to school after that.
Q. So did you drop out of school?
A. No.
Q. So what happened then?
A. I went maybe like three or four times, but it would be for like a half of a day.

4 (Pages 10 - 13)

PApp 4                                    Ex. 1

Page 14

Q. Did some doctor tell you that you couldn't go to school full-time?
A. One doctor said -- the one from Des Moines said that half days were good until I can get back in like the -- until I can get back in the full days.
Q. And what Des Moines doctor was that?
A. The sports medicine.
Q. Okay. But, again, you haven't seen him since November of 2019; correct?
A. Correct.
Q. Did you go to somebody else who told you that you shouldn't go to school full-time?
A. No.
Q. When you were at Roosevelt -- I'm sorry. So what did you end up with for your final grades at Ankeny your end of your sophomore year?
A. They were -- there was no grades there.
Q. What do you mean there were no grades there?
A. Like I didn't go to school in order for there to be a grade, and then Corona happened.
Q. So did you drop out?

Page 15

A. I didn't drop out. I just -- whenever I did go, I had an online class that I would sit and I would work on all day until it was finished.
Q. So I am not understanding. Did Ankeny High School consider you as attending their school and completing your sophomore year?
A. Yeah.
Q. But they didn't give you grades?
A. Correct.
Q. Why do you think you'll be a sophomore then?
A. I didn't really finish the year, and I feel that I would be more beneficial to just completely redo the year rather than just doing the bare minimum to get by and barely learning it.
Q. Have you seen a doctor since you moved to Indiana?
A. No.
Q. What injuries do you claim that you have from this fight?
A. Currently or when it happened?
Q. When it happened.
A. A concussion and whiplash and scratches

Page 16

on the back.
Q. Have the scratches on your back healed?
A. Yes.
Q. How long did it take for them to heal?
A. Probably like a week.
Q. And you didn't have to have any like medical treatment for them, did you?
A. No.
Q. Is your whiplash healed?
A. I think so.
Q. And how long did it take for your whiplash to heal?
A. Probably like three or four months.
Q. And who told you that you had whiplash?
THE WITNESS: Mom, do you remember which one it was?
Q. If you don't know the answer to my question, you can say you don't know, and I can ask your mom later because she can't answer for you today.
A. I don't know.
Q. Okay. And then how about your concussion?
A. That lasted like four months.
Q. So if your concussion only lasted four

Page 17

months, then why couldn't you finish out the rest of your school year your sophomore year?
A. My anxiety got really bad, and it was hard for me to just leave the house.
(The requested portion of the record was read by the court reporter.)
Q. So are you claiming that you have anxiety as well?
A. Yes.
Q. And who diagnosed you with anxiety?
A. I have a therapist.
Q. And who is your therapist?
A. His name is Michael.
Q. What's Michael's last name?
A. M-c-L-n-r-o-y {sic}.
Q. Can you spell that again.
A. M-c-L-n-r-o-y {sic}.
Q. And where is your therapist Michael located?
A. Ankeny.
Q. And when did you start seeing him?
A. Just a couple weeks ago.
Q. Pardon me?
A. Just a couple weeks ago.

5 (Pages 14 - 17)

800-567-8658    973-410-4098

PApp 5    Ex. 1

Page 18

Q. I thought you moved to Indiana in May. Are you doing it online?

A. Yeah.

Q. So Telemed? So you just started seeing him two weeks ago?

A. Yes.

Q. And who recommended that you see him?

A. Me and my mom.

Q. And has he diagnosed you with anxiety?

A. Yes.

Q. And what is your anxiety from?

A. I have some anxiety from the fight and some anxiety from things that happened a while ago.

Q. Like what happened a while ago?

A. Just things from like when I was a kid.

Q. Well, are you claiming that you have anxiety from this fight?

A. Yeah.

Q. Then you're going to have to tell me, what are the things that happened when you were younger that also cause you anxiety?

A. Things like when my mom was little -- or when I was little and I was taken away from my mom and my dad was taken away and my mom

Page 19

had like boyfriends that would abuse her.

Q. Is Michael the first therapist you've ever seen that you know?

A. I saw one when I was little, but I don't really remember it.

Q. So have we now talked about all of the injuries you claim from this fight?

A. Yes.

Q. So we have concussion, whiplash, scratches on your back, and then anxiety; correct?

A. Yes.

Q. And after the fight occurred, you did not see anybody for anxiety until you started seeing Michael two weeks ago; correct?

A. Correct.

Q. And when did you start noticing you had anxiety as it related to this fight?

A. After it happened, I wouldn't leave the house. And if I did, I wouldn't be by myself, and I would have panic attacks all the time. I was always like looking who was around me.

Q. Did you discuss that with your sports medicine doctor, Dr. Carlson?

Page 20

A. I don't remember.

Q. Are you on any medication today?

A. No.

Q. Were you given any medication that you remember after this fight occurred?

A. I remember I got something because I couldn't sleep.

Q. I think I saw a reference to Ambien, maybe. Did you take it, do you know?

A. Yes.

Q. How long did you take that medication?

A. Maybe like a week.

Q. And then why did you quit taking it?

A. I just didn't have any left, and I didn't need a refill, but I also believe that I had something for my dizziness.

Q. How long did you take that for your dizziness?

A. I am not sure.

Q. And I don't remember you telling me about dizziness. When did you have dizziness?

A. It was from whenever I got my concussion and my whiplash.

Q. How long did your dizziness last?

Page 21

A. Just like three or four months.

Q. Now, the girls that you were in a fight with, what are their names?

A. Do you need their first and last name?

Q. If you know it.

A. Mya Williams, Shene Lang, and Francine Cole.

Q. Had you gone to Merrill with any of those three girls?

A. Yes.

Q. Which girls?

A. Shene.

Q. Your freshman year at Roosevelt did you meet Mya --

A. I met her my eighth-grade year, but she didn't go to school with me.

Q. Where did she go to school?

A. Roosevelt.

Q. Was she a year older than you?

A. Yes.

Q. So you met her -- I'm sorry -- what year?

A. My eighth-grade year.

Q. How did you meet her your eighth-grade year if --

6 (Pages 18 - 21)

Page 26

games?

A. Yes.

Q. And why would you go to the Roosevelt football games?

A. I have a best friend who plays for the football team.

Q. So how many did you go to before this fight occurred?

A. One.

Q. What game was that?

A. Roosevelt versus Ankeny.

Q. And where was that at?

A. Drake stadium.

Q. And was this the homecoming football game?

A. No.

Q. When was it in relationship to the homecoming dance?

A. What do you mean?

Q. Do you remember, like was it a month before the homecoming dance? Two months before?

A. Probably just like a couple weeks.

Q. And who did you go there with?

A. My friend, Katie.

Page 27

Q. Did you have any problems or disagreements with anybody while you were at that football game?

A. No.

Q. Did you have those three girls' cell phone numbers?

A. Just one.

Q. Whose did you have?

A. Mya.

Q. And how did you have her number?

A. It was just from in my contacts from a long time ago, like my fresh -- or my eighth-grade year.

Q. And why would you have her number if you guys weren't friends?

A. Like if her sister would text me off of her phone or something like that.

Q. Had you received any texts or had any text exchanges with any of those three girls before the homecoming dance?

A. Yes.

Q. What had happened?

A. Mya had asked me why I was following somebody on Instagram. She had dated this boy a long time ago. He's from Texas, and

Page 28

his name is Jack. I don't really know him, but we just saw each other on Instagram. And she didn't like that, so she just asking me about that.

Q. So Mya dated some guy named Jack from Texas? Is that what you're saying?

A. Yes.

Q. And when had she dated him?

A. It would be like probably two years ago now.

Q. Did you say his name was Jack?

A. Yes.

Q. What's his last name?

A. I don't know.

Q. Did he used to live here?

A. No.

Q. How did she date him if she lived in Iowa and he lived in Texas?

A. I am not sure. I think she would just call him.

Q. So how is it that you got hooked up with him on Instagram?

A. He just followed me. I don't know why.

Q. Well, and did you follow him?

A. I followed him back whenever he followed

Page 29

me.

Q. And so Mya found out about that?

A. Yes.

Q. And when did she find out about that?

A. I am not sure.

Q. What did she say to you when she found out?

A. She was calling me like nasty things and like asking why I had him on my Instagram and stuff like that.

Q. And what did you tell her?

A. I just said he followed me, and that was that.

Q. And when did she do this in relationship to the fight?

A. Like after the Roosevelt and Ankeny football game.

Q. And are you talking about she did it that night after the game or days after?

A. Sometime after.

Q. And did she call you on the phone, or did she text you?

A. She Snapchatted me.

Q. And did you save any of those Snapchats?

A. I don't have them because I don't have

8 (Pages 26 - 29)

Page 30

her on my phone.
Q. I don't understand what that means. Did you save --
A. I don't have her on my Snapchat.
Q. Well, did you save any of them?
A. I don't believe so.
Q. And how many times did she do this?
A. Just once.
Q. We didn't hear that answer.
A. Just once.
Q. And what did she say?
A. I don't remember everything exactly. I know she said something like why do I have him on my Instagram. She said that I was a ho and that I was -- I don't mean to cuss, but she said that I was a bitch and that I was weird. And I was like, okay, bye. And then she was like you're weird, and then I just blocked her because I wasn't going to do that.
Q. When you were at the football game, did any of her friends or one of those other two girls come up and say something to you?
A. Shene came over to me and asked me a question. I don't remember what she said

Page 31

exactly.
Q. Well, was it a friendly conversation? Was it a mean conversation? Was it an angry conversation? Did you hear my question?
A. No.
Q. Was it a friendly conversation that you had with Shene at the football game?
A. I am trying to think. Oh, she came up to me and had asked me if I had a problem with Mya. And I said no, why. And she was like, oh, I was just wondering because somebody said something, and I was like okay, and then that was the end of the conversation.
Q. So before the homecoming dance on October 5th, you had just ran into those guys -- or you just ran into them at the Roosevelt-Ankeny football game, and then you had some Snapchats with Mya, and that was it; is that what you're saying?
A. Yes.
Q. Did you have any other Snapchats or texts with anybody else before the fight?
A. No. I had posted something on my story that said does anybody want to take pictures

Page 32

with me at homecoming, and one of the girls had screen-shotted it.
Q. What do you mean by that?
A. Like if somebody posts something, they can like take a picture of it off of their phone, and it will tell you that they took a screen shot of it.
Q. Did she do something with it that you're aware of?
A. Probably just sent it to her friends.
Q. Why did you go to the Roosevelt homecoming dance?
A. I went with my best friend.
Q. Which was who?
A. Kathryn.
Q. What's her last name?
A. Hirth.
Q. But why did you go?
A. She invited me to go with her.
Q. And at that time you knew that Mya was mad at you or angry with you for following her old boyfriend?
A. Yeah.
Q. Pardon me?
A. Yeah.

Page 33

Q. Now, to go to the dance do you have to get permission to attend since you didn't go to Roosevelt?
A. Yes.
Q. And so how do you go about doing that?
A. First Katie has to get it signed by her principal, and I have to get it signed by somebody from Ankeny.
Q. Do you have to tell them why you want to go?
A. I don't remember. I don't think so.
Q. And I have the dance being on October 5th; does that sound about right?
A. Yes.
Q. How did you get to the dance?
A. I had went to our friend, Kristina's, house with Katie the night before, and we stayed the night there, and she took us.
Q. The dance was on a Saturday; correct?
A. Yeah.
Q. What's Kristina's last name?
A. Let me look real quick. It's C-i-n-a-g-l-i-a.
Q. Does she still go to Roosevelt?
A. She's graduated. She's a mom.

9 (Pages 30 - 33)

**Page 42**

A. Correct.
Q. And who was sitting at the table?
A. I am not sure. There was a lot.
Q. Are they teachers, administrators, chaperones?
A. Teachers and administrators.
Q. Were there more than two people there?
A. Yeah, there was a couple tables.
Q. Sometimes I think at these dances like they might have you broken down by alphabet.
A. Yes.
Q. Say A through C goes here. Did they kind of do the same thing there?
A. Yes.
Q. So then you walked into the dance with your friend, Katie, and you guys signed in at that table; correct?
A. Correct.
Q. Then is there an area up there to hang around?
A. Not really, no.
Q. Do you remember Principal Biggs?
A. I remember seeing him.
Q. Was he at the dance?
A. I think.

**Page 43**

Q. So when you signed in, you saw some teachers and administrators; is that right?
A. Correct.
Q. And they were up there in the area where the tables were to sign in?
A. Yeah.
Q. And then you went down where it says entrance. That's the escalators; correct?
A. Correct.
Q. And then, in that couple of hours before you had the exchange with those girls, what all did you do?
A. I had taken photos with friends and just was at the dance floor with them.
Q. Do you remember who you were taking photos with or dancing with?
A. I took photos with a lot of people. People who were standing around me when I was dancing was like my friend, Autumn; my friend, Katie; my friend, Jaekwon, and his friends.
Q. And you didn't have any issues when you were on the dance floor, did you?
A. I did.
Q. What happened on the dance floor?

**Page 44**

A. They had came over, and they started like pushing me and yelling, but I didn't know what they were saying because the music was like really loud right there.
Q. Was that in those few minutes before the fight broke out?
A. Yes.
Q. But before that, when you were dancing, did you have any issues?
A. No.
Q. How about when you were over in the photo booth? Did you have any issues with anybody over there?
A. No.
Q. So I think you said it was a few minutes before the fight broke out that they were pushing you?
A. Correct.
Q. And who was pushing you?
A. I am not sure which one it was or if it was all of them because it was behind me.
Q. Well, if it was behind you then how do you know someone pushed you and didn't just fall on you because of the dance floor?
A. Because they had came up to me, and they

**Page 45**

were on the side of me, and then they walked behind. And somebody had pushed me, and when I turned around, they were right there.
Q. And there were other students around you as well; correct?
A. Correct.
Q. The dance floor was pretty crowded?
A. Yes.
Q. So, again, you felt someone push you, but your back was turned toward them; correct?
A. Correct.
Q. And the music was loud, so you couldn't hear anything anybody was saying; correct?
A. Correct.
Q. So then what did you do after that?
A. I had told my friends that I was -- like I didn't feel safe and that I wanted to go, so I went over to Dowler.
Q. What made you not feel safe if you hadn't had any issues with them?
A. Them pushing me.
Q. Well, you said you got pushed once. Are you saying you got pushed more than once?
A. I am not sure.

12 (Pages 42 - 45)

Page 46

Q. So that one push made you not feel safe?
A. Yeah.
Q. But you don't know who did it, and you didn't hear anybody say anything at that time; correct?
A. Correct.
Q. So then you told your friends you didn't feel safe, and you went over to Mr. Dowler. And where was Mr. Dowler at that time?
A. On like the left side where it says cocktail table, like in between the photo booth and the dance floor.
Q. Nevaeh, did you tell me that you had a printer? Could you print off Exhibit C for us?
A. Yes.
Q. So maybe we should take a little break here for a second, or do you have a printer right there where you were at?
A. I just sent it to my uncle and asked him to print it for me.
Q. Okay. And then is he going to bring it to you?
A. Yeah.
    MS. THOMAS: It's been about an

Page 47

hour. Should we take a little break here while we're waiting for that?
    THE WITNESS: Sure.
    MS. THOMAS: Thank you.
    THE WITNESS: Yes, thank you.
    (A recess was taken.)
BY MS. THOMAS:
Q. Nevaeh, so you have Exhibit C in front of you, and you told me you have a pen; correct?
A. Correct.
Q. Would you mark with an X where Mr. Dowler was when you went and talked to him.
A. Yeah. (The witness complied.) Probably like in that area (indicating).
Q. Could you do me a favor so that we can see it better. Could you put a circle around that.
A. Yeah. (The witness complied.)
Q. Oh, perfect. Okay. So you have marked on Exhibit C with an X and a circle where Mr. Dowler was at when you went over and talked to him; is that right?
A. Correct.

Page 48

Q. And maybe when we are done here you can just find some way to get that to your mom to get to Jeff. Okay? Exhibit C?
A. Yeah.
Q. That would be great.
    All right. So did you leave the dance floor then and walk over there, or tell me what happened?
A. I left the dance floor and walked over there.
Q. Did you know he was over there when you went on the dance floor?
A. What do you mean?
Q. Well, strike that. Why did you go over there?
A. Because I knew that something was going to happen. I just had like a feeling, and I wanted somebody to know.
Q. Did you see him before you went on the dance floor?
A. No.
Q. So did you get off the dance floor looking for somebody?
A. Yes.
Q. And was he the first person you saw?

Page 49

A. Yes.
Q. Did you know him?
A. Yes.
Q. Had you had him for class?
A. Yes.
Q. So you went over to him because you said you knew something was going to happen?
A. Yeah.
Q. Well, how did you know something was going to happen?
A. Just the way that they act. These girls, they've fought people before and just the way that they act.
Q. But you hadn't had any interaction with them before where they wanted to fight you; correct?
A. Correct.
Q. And they hadn't been fighting anybody at the dance that night, had they?
A. No.
Q. So I am still a little confused as to why your one push you thought was a sign that something was going to happen.
A. Like they were going over, and I knew that they were saying something. But it was

13 (Pages 46 - 49)

Page 50

loud, so I don't know what it was that they were saying. And I knew how these girls act, and I knew that I hadn't done anything so there would be no reason for them to do something like that unless they were going to fight.

Q. Well, I am just having a hard time understanding that.

A. They were friends with Mya, and I knew that Mya didn't like me, and so I just had like a feeling.

Q. And you knew that Mya didn't like you, but you still chose to go to the dance; correct?

A. Correct.

Q. So you went over to Mr. Dowler, and then what did you do when you got over by him?

A. I said, hey, Mr. Dowler, these people are trying to fight me. He was like -- just kind of giggled, and he was like who. And I said Mya, Francine and Shene. And when I said that, I just kind of like pointed over there. And he was like oh, well, ha, ha, maybe you should just go somewhere else.

Q. And did you have any other conversations

Page 51

with him?

A. No.

Q. Did he talk to you at all about how you were doing at your new school or anything of that nature?

A. No.

Q. So he told you maybe you should just go somewhere else?

A. Yep.

Q. Did he ever tell you to go stand off to the side, or did he just tell you to go somewhere else?

A. Go somewhere else.

Q. And so what did you do at that time?

A. I knew that he wasn't going to do anything, so I just went and grabbed my stuff from -- do you see where it says coats?

Q. On Exhibit C?

A. Yeah.

Q. Yes.

A. My shoes were on a rack over there, so I just went and grabbed them, and I was getting my stuff, and I was leaving.

Q. And was anybody with you at that time?

A. Yes.

Page 52

Q. Who?

A. Kathryn.

Q. Did you tell Kathryn that you were going to leave?

A. Yeah. She was coming with me.

Q. When you walked over there to get your shoes and to leave, did you feel that you were in danger?

A. Yes.

Q. Now, you knew that there were people at the top of the -- if you took the escalator up, there would be -- those other teachers, administrators, or other people were sitting there at the desk; correct?

A. They had left. They had taken all of the tables out because they didn't need them anymore.

Q. But were there administrators or teachers that stay up there to make sure people are leaving or coming in or --

A. I didn't see any.

Q. Well, you weren't up there, were you?

A. No, but when I did go up there, I didn't see any.

Q. So it's your claim that there was

Page 53

absolutely no teacher, no chaperone, no administrator up at the top when you left?

A. Correct.

Q. And is that the way you left, or did you go out a different door?

A. That's the way I left, and then there was a woman outside who had worked for the school.

Q. All right. So let's get back to -- so you grabbed your shoes -- or you went over to the coat area to grab your shoes with Kathryn. And then what happened?

A. When I was walking to leave, we had kind of walked towards like the cocktail tables because we had another friend that was with us, and I was going to stand over there and wait while Katie went to the dance floor and got her. And then, while me and Katie got there, they had come up to me, and then it happened.

Q. Well, I thought you and Katie were the only two that came together.

A. No, I said that, whenever we were at the dance floor, there was Katie and Autumn, and then she had left with us. She didn't arrive

14 (Pages 50 - 53)

Page 54

with us, but she left with us.

Q. So you were going to go get Autumn to leave with you?

A. Correct.

Q. What's Autumn's last name?

A. Sona.

Q. So you went and stood over there while Katie went to get Autumn?

A. Yeah.

Q. And then what happened?

A. Well, Katie didn't even like leave yet, and it happened right there.

Q. And what happened?

A. I was walking, and somebody grabbed me -- Shene like grabbed my hair, and she started hitting me. And I like threw my stuff down, and she wouldn't stop. And I turned around, and I hit her back. And then Francine ran and came and grabbed me and started hitting me. Somebody pushed her off of me, and then I was like leaving, and Mya came and hit me, and then I had ran up the stairs.

Q. Now, you agree that, after someone hit you, then you turned around and threw a few

Page 55

punches at her as well; correct?

A. Yep.

Q. And so then, after you got hit, did anybody come to try to break up the fight?

A. Not until the second girl started hitting me.

Q. And then what happened?

A. And then somebody came and like pushed her off of me.

Q. And you were standing up at that time?

A. Yeah.

Q. And who was that, if you know?

A. That broke it up?

Q. Yes.

A. One of them was Quincy.

Q. Who is Quincy?

A. He goes to Roosevelt.

Q. Did a staff member or teacher, administrator, or anybody break it up?

A. Not that I know of.

Q. Have you looked at the video that you produced, your attorneys produced?

A. A long time ago.

Q. So you don't think that any staff member came and broke up the fight?

Page 56

A. I don't recall, but I can look at the videos, if you would like me to.

Q. So after the fight got broken up, then what did you do?

A. I had ran out the entrance, like the escalators, and then I ran out the door.

Q. And then what did you do?

A. There was a lady out there who I had seen at the school before. She works with like the special-needs kids. So I had told her what happened, and she just kind of put down what I said in her phone.

Q. She put down what you said in her phone? I don't understand that.

A. Like she asked me what had happened, and she just wrote it -- or like typed it up in her phone.

Q. And who is this person?

A. I don't know her name.

Q. But she was one of the special education teachers?

A. Yes.

Q. So then what did you do after that?

A. I had waited for my friends like while I was talking to her to come so I could leave.

Page 57

Q. And how did you leave? Did you hear me?

A. Katie's dad came, and we just got in the car and left.

Q. What's Katie's dad's name?

A. Cory.

Q. Cory Williams?

A. Hirth.

Q. I'm sorry. Hirth. Okay. When you were talking to Mr. Dowler, you told me that was kind of a brief conversation; is that right?

A. Correct.

Q. Well, do you think it lasted a couple seconds?

A. Yeah.

Q. And then how long after you spoke to him did that fight occur?

A. Maybe like a minute.

Q. And during the period in time where they were hitting you, you were standing up the whole time; correct?

A. Yeah.

Q. And how many punches did you throw at that other girl?

A. Two.

Q. How many girls did you hit?

15 (Pages 54 - 57)

**Page 58**

A. One.

Q. And then, when Katie's dad came and picked you guys up, did you tell them about the fight?

A. Yes.

Q. And what did he say?

A. Nothing.

Q. So what did you tell Katie's dad?

A. We just said that there was a fight that happened, and that was about it, and then he just took us home.

Q. Did you tell him that you were involved in the fight?

A. Yes.

Q. And he didn't do anything about it?

A. He just said call your mom.

Q. Did you call your mom?

A. Yeah.

Q. That night?

A. Yes.

Q. Did you stay overnight at Katie's, or what did you do?

A. Yes, I stayed the night.

Q. What did you tell your mom when you called her?

**Page 59**

A. I said hey, Mom, I got in a fight, these girls jumped me, and that was about it.

Q. And did she ask you if you were hurt?

A. She asked me like who was it, are you okay, like -- yeah.

Q. So when she said who was it, what did you tell her?

A. Mya, Francine, and Shene.

Q. When she said are you okay, what did you say?

A. I said that my neck and my head hurt really bad.

Q. But you didn't go to the doctor?

A. No.

Q. She didn't come get you?

A. She had asked me -- while we were on the phone, she actually told me that my aunt -- my aunt passed away.

Q. And is that the aunt that died in an auto accident?

A. Yeah.

Q. And what was her name?

A. Judy.

Q. Pardon me?

A. Judy.

**Page 60**

Q. What was Judy's last name?

A. I believe it was Scott.

Q. What is it?

A. Scott.

Q. And had she died that evening?

A. She had died that night when it was happening.

Q. So the accident didn't happen that evening of the dance?

A. It happened in like -- in the night like the same time that the fight was happening.

Q. And so then, when you talked to your mom, your mom had to tell you that sad news about your --

A. She said she had an accident. She said do you want me to come and get you, and I was like, no, I am fine. Like I didn't want to sit in the car for a while, and I just wanted to go to sleep.

Q. Okay. So what did you guys do then after you spoke to your mom and you were at Katie's house?

A. We went downstairs and called Katie's mom, and she said that she would talk to her friend, who was a -- the new resource officer

**Page 61**

at the school.

Q. And do you know who that is?

A. I don't know his name.

Q. Was it Mr. Underwood?

A. Yeah.

Q. What's Katie's mom's name?

A. Ann.

Q. Hirth?

A. Yeah.

Q. Did she ever talk to the resource officer that you know of?

A. I believe so.

Q. But you weren't present when she talked to him?

A. Correct.

Q. And then what did you guys do?

A. I went to bed.

Q. Then what did you do the next day?

A. When I woke up, my mom came and got me.

Q. What time was that?

A. And then -- probably like 9:00 or 10:00 in the morning.

Q. Did you call your mom that night on your cell phone?

A. Yeah.

16 (Pages 58 - 61)

Page 62

Q. What's your cell phone number?
A. I don't have one. It was through Messenger.
Q. What's Messenger?
A. It's like an app connected to Facebook where you can like text and FaceTime people.
Q. So I am really stupid on this stuff. So you have to explain that to me.
A. I video chatted my mom through an app.
Q. An app on what?
A. What do you mean?
Q. I mean on a -- it's not on a phone?
A. It's on my phone, yeah.
Q. So you have a phone?
A. I have a phone. It's just not on it.
Q. But you can do apps to chat?
A. Yeah, if I have Internet, I can talk to my mom on that.
Q. Well, how did you talk to your mom? Through her cell phone?
A. She has the app, too, on her phone.
Q. So you just texted back and forth?
A. I video called her on it.
Q. But it doesn't record the calls?
A. I have no idea.

Page 63

Q. Well, what's the number on your phone?
A. I don't have one.
Q. It doesn't have a number?
A. Correct.
Q. How about your mom's?
A. (515) 499-3361.
Q. 499-3361?
A. Correct.
Q. How does your mom respond back to you?
A. What do you mean?
Q. Well, if you video chat her, how does she respond back to you? Is it going through you through a number, or is it going through you through a website? Do you have a handle or something like, you know --
A. Do you want me to -- is it easier if I show you?
Q. Well, you can show me if you want.
A. Like so if you open this app right here and click on my mom's name, and at the top there it's like a call or a FaceTime (indicating).
Q. But your phone has no number?
A. Correct.
Q. Do you have a number now?

Page 64

A. No.
Q. How did -- okay. So then your mom came and got you, and then what did you guys do?
A. I went home, and then I laid down because I didn't feel good with an ice pack. And I told her that I needed like -- we were going to go to the courthouse to press charges, and then we went there.
Q. You went to the -- did you go to the police station?
A. Yeah.
Q. And did you talk to an officer there?
A. Yes.
Q. And then what did you do?
A. I -- we had went to the hospital.
Q. And when you were at the police station, did you feel like you were hurt?
A. Yes.
Q. What type of symptoms were you having at that time?
A. I was puking, and my head hurt really bad. My neck had hurt. My back felt like it was very like -- I don't know the word -- like tender, like if my clothes would touch it or something, because that -- when I

Page 65

didn't know that there scratches back there, and -- yeah.
Q. Are you claiming that you were puking when you talked to this officer?
A. Not at like the same time I was talking to him.
Q. Did you tell the officer that you had been puking?
A. Yes.
Q. When did you tell the officer that?
A. He was asking my mom if we had went to the hospital and if anything was wrong with me, and she had said, no, but like she has been like getting sick and her head hurts and everything like that. So he recommended that we should probably go to the doctor.
Q. Do you know why he doesn't have that you were puking in his report?
A. Nope.
Q. You said that you reported that you were nauseous, but he doesn't say puking. But it's your claim that you were puking; is that right?
A. Yeah, yeah.
Q. When did you start puking?

17 (Pages 62 - 65)

Page 86

A. I had to write down like a statement of what happened.

Q. Anybody else that you spoke to about what happened that we haven't talked about?

A. No.

MS. THOMAS: That's all I have. Thank you.

CROSS-EXAMINATION

BY MR. LIPMAN:

Q. Nevaeh, I have a couple questions for you. Have you ever been expelled from school?

A. No.

Q. Have you ever been suspended from school?

A. No.

Q. Have you ever had detention that you were required to serve?

A. No.

Q. Had you ever been in trouble in any way, shape, or form that you know of at school?

A. No.

Q. You talked about some problems that you had when you had your concussion. Tell us what it's like when you suffer from a

Page 87

concussion. What are your symptoms?

A. Really sensitive to the light and the noise. My head always hurts. Like I always feel super sick and dizzy and don't want to do anything. I just kind of want to sit in a dark room all day. And I kind of -- I feel like I forget things, and it's hard to remember a lot of things.

Q. Concentration is a problem?

MS. THOMAS: Objection to the form.

A. I can't focus on things, or I'm not really good at paying attention. Like if I go to school, I have a really hard time focusing, and I get this ringing in my ears like all of time.

Q. You mentioned to Ms. Thomas that you felt it was better for you to go to Indiana. Could you kind of elaborate on that. What do you mean by that?

A. Like I am not -- I don't have to worry all of the time that I am not safe, and I don't have to be scared all of the time, and I don't have to like freak out and like have a panic attack every time I leave the house.

Q. Okay.

Page 88

A. So like if I move here, it's like better for me and my future, and I can finally just like breathe.

MR. LIPMAN: I have nothing further.

REDIRECT EXAMINATION

BY MS. THOMAS:

Q. Well, okay. Let's start all over again. We've been here for two hours. You've never told me you had ringing in your ears. When did you have ringing in your ears?

A. It just happens like off and on.

Q. You told me that you recovered from all of the injuries in this accident. Are you claiming now that you have problems?

A. And I still get headaches, and I get dizzy sometimes, but those are kind of just like permanent things.

Q. Well, you never told me you had permanent problems. So earlier you told me you had recovered. Is it now your story that you have not recovered?

A. Yes.

Q. And so let's talk about the permanent problems that you think you have.

Page 89

A. The ringing in my ears, the dizziness, the headaches, the feeling nauseous.

Q. Anything else?

A. No, not that I can think of.

Q. So when did the ringing in the ears start?

A. It's been happening since I got like my second concussion, so I've had it.

Q. So you've had it before you even had the concussion from this fight?

A. Correct.

Q. All right. So that was something that you -- a symptom that you already had?

A. Yeah.

Q. And how often do you get it?

A. Maybe like a couple times a week.

Q. But that was something that you experienced before you had the concussion from this fight; correct?

A. I had had it, but it had gotten worse.

Q. It had what? I'm sorry.

A. Gotten worse.

Q. And how did it get worse?

A. Like it started occurring more often.

Q. So before the accident after your second

23 (Pages 86 - 89)



so for what happened last night. i want to apologize for what happened. my actions were out of character and wrong and that whole situation wasn't needed. i wanted to apologize on behalf of starting this; i just lost my boyfriend and i know you just lost your aunt and my actions were out of anger because of losing him and i took that out on you when none of this was your fault and none of that was needed. i know you don't care or whatever. but i wanted to own up to what i did and apologize for that. So im genuinely sorry for that.

so yeah i'm sorry:

you don't have to respond or anything i just wanted to lyk that.

As much as I appreciate the

DEPOSITION EXHIBIT B - Page 1
**PApp 16**                    **Ex. 1**

1

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

KRISTY MITCHELL, individually:
and as mother and next      :
friend of NEVAEH OSORIO,    :
                            :
            Plaintiffs,     :
                            :  No. 4:20-cv-00109-SMR-HCA
        vs.                 :
                            :
DES MOINES INDEPENDENT      :
COMMUNITY SCHOOL DISTRICT   :  VIDEOCONFERENCE
and TIMOTHY DOWLER,         :  DEPOSITION OF
                            :
            Defendants.     :  KATHRYN LYNN HIRTH
                            :

DEPOSITION OF KATHRYN LYNN HIRTH, taken
before SueAnn Jones, Certified Shorthand Reporter and
Notary Public, by videoconference means with all parties
appearing from their respective locations, commencing at
3:45 p.m. on September 21, 2020.

Reported by:  SueAnn Jones, CSR, RPR
Veritext Legal Solutions
800-567-8658

2

A P P E A R A N C E S

Plaintiffs by:      JEFFREY M. LIPMAN
                    (By Videoconference)
                    Attorney at Law
                    1454 30th Street
                    Suite 205
                    West Des Moines, Iowa 50266

Defendants by:      JANICE M. THOMAS
                    (By Videoconference)
                    Attorney at Law
                    801 Grand Avenue
                    Suite 3700
                    Des Moines, Iowa 50309-8004

Also Present:       Ann Hirth
                    (By Videoconference)

3

I N D E X

EXAMINATION BY          DIRECT    CROSS    REDIRECT
Ms. Thomas                4                   53
Mr. Lipman                          49

4

KATHRYN LYNN HIRTH,
called as a witness, having been first duly sworn,
was examined and testified as follows:

DIRECT EXAMINATION

BY MS. THOMAS:

Q.  Okay.  Before we get started, I just want to ask, ma'am, do you want me to call you Katie or Ms. Hirth or Kathryn?  What do you want me to call you?

A.  Katie is fine.

Q.  Okay.  Katie, is there anybody in the room with you today?

A.  Yes.

Q.  And who is in the room with you?

A.  My mother.

Q.  And could you tell the court reporter your mother's name, please.

A.  Ann Hirth.

Q.  And Ms. Hirth, where are you standing or sitting?

A.  She's right next to me.

Q.  Okay.  Right next to you on the side.  Okay. Perfect.  I appreciate that.

Okay.  Just for the record, we are going to stipulate that this is the deposition of Katie Hirth, and it's taken by Zoom by agreement of counsel, and the court reporter is not present with the witness, and

13

A. We hung out. We spent the night at each other's houses, things that friends would do.

Q. Now, let's focus on your sophomore year of high school. Okay? Did Nevaeh ever go to a football game with you that year --

A. Yes.

Q. -- that you remember?

A. Yes.

Q. And do you remember what game that was?

A. There was multiple.

Q. So she went to more than one?

A. Yes.

Q. And that was before the homecoming dance?

A. Yes.

Q. And after the homecoming dance?

A. Yes.

Q. Nevaeh told me in her deposition that when she had attended a football game with Roosevelt that she had not had any problems with those girls at a football game.

Is that your recollection as well?

A. Yes.

Q. Now, the homecoming dance, I think, was in October of last year, 2019; is that right?

A. Yes.

14

Q. And how could Nevaeh come to the homecoming dance at Roosevelt if she was not a student?

A. They had a form that was in the front office she filled out and had signed by an administrator at Ankeny High School.

Q. Did she have to have somebody from Roosevelt with her or sign it?

A. Yes.

Q. And was that you?

A. Have it signed?

Q. I asked a poor question. Were you the one that invited her to the homecoming dance?

A. Yes.

Q. And so did you have to have somebody at Roosevelt sign it for you to bring her or not?

A. No.

Q. So there's a form that you pick up for her, and then she takes to Ankeny, and they sign it?

A. Yes.

Q. And then they bring it back, and then she's allowed to go to the dance with you?

A. Yes.

Q. Did your principal at Roosevelt have to sign it, if you know?

A. No.

15

Q. No, you don't know or no, the principal didn't have to sign it?

A. No, I don't know.

Q. And why did you invite her to go to the dance?

A. Because she had gone with me the previous year, so we went again this year.

Q. When you had gone to previous years' dances, had you guys had any issues?

A. No.

Q. And when you invited her to go to the dance, the homecoming dance, were you aware of anybody having -- any of these three girls having any issues with her?

A. Yes.

Q. You were aware of that at the time you invited her?

A. Yes.

Q. Did you tell her that?

A. Nevaeh?

Q. Yes.

A. Nevaeh was the one that told me.

Q. Okay. Well, she's testified that she didn't have any issues with them before she got to the dance. So when did she tell you?

A. From what I'm -- what I'm aware, she -- they had had a disagreement.

16

Q. And who had had a disagreement?

A. Mya Williams.

Q. And when did Mya and her have a disagreement?

A. That summer.

Q. And what had they had a disagreement about?

A. One of Mya's ex-boyfriends.

Q. Okay. And what had happened?

A. Mya had thought that Nevaeh was talking to one of her ex-boyfriends, and that was untrue.

MS. THOMAS: SueAnn, did you get that? Because she cut out on my end.

(Record read.)

MS. THOMAS: Thank you.

Q. And had they had a discussion that summer?

A. Not in person.

Q. Just texts or what?

A. Yes.

Q. Or phone call? What was it?

A. Snapchat, texting.

Q. Okay. And when did you know about this?

A. Shortly after it happened.

Q. And so knowing that, you still invited her to come to the homecoming dance?

A. Yeah.

Q. And she came to the homecoming dance?

17

A. Yes.

Q. And so at that point in time, you weren't concerned that there was going to be a fight, did you?

A. I was not aware that there was going to be an issue, no.

Q. Did you just think that Mya was mad earlier that summer that she thought she was texting some old boyfriend?

A. Yes.

Q. And you didn't tell anybody at the school about that, did you?

A. No.

Q. And Nevaeh didn't tell anybody at the school about that, did she, that you're aware of?

A. Not that I'm aware of.

Q. Okay. So how did you get to the dance that night?

A. My dad took us.

Q. And where did you pick Nevaeh up at?

A. Nevaeh was with me.

Q. Had she come to your house earlier that day? Or tell me about that.

A. We were at -- the night before we spent the night at one of my mom's friends' houses.

Q. And who was that?

18

A. Christina Somalia (phonetical).

Q. And she's one of your mom's friends?

A. Yes.

Q. And why did you guys spend the night at one of your mom's friends?

A. Because she was going to do our hair and makeup the next day.

Q. Christina wasn't a student at Roosevelt?

A. No.

Q. The dance was in the evening; correct?

A. Correct.

Q. Then why would it be that you needed to go to her house the night before?

A. So we wouldn't have to make two trips to her house.

Q. Why would you need to make two trips? I am not understanding.

A. Because we had hung out with her the night before.

Q. Okay. So then did your dad -- did you guys stay at her house until it was time to go to the dance?

A. A couple hours before the dance started, we left.

Q. And your dad picked you up?

A. Yes.

Q. And where did you guys go then?

19

A. To take pictures.

Q. And where did you take pictures?

A. Mercy.

Q. Did you read Nevaeh's deposition?

A. Did I?

Q. Yes.

A. No.

Q. And where did you take pictures at Mercy?

A. Next to the helicopter.

Q. And then after pictures, then did your dad -- where did your dad take you guys?

A. We went to the sculpture park to take more pictures.

Q. Okay. And then where did you go?

A. Then we went to the homecoming dance.

Q. Was anybody else with you and Nevaeh?

A. Not until we arrived.

Q. Okay. Then when you got to the dance, did someone join up with you?

A. Yes.

Q. Who joined up with you?

A. Our friend Autumn.

Q. What grade was Autumn in?

A. She was a ninth grader.

Q. Do you know about what time you got to the dance?

20

A. No.

Q. I think Nevaeh thought that the fight happened towards the end of the dance. Is that your recollection?

A. Yes.

Q. And she thought maybe you guys had been at the dance a couple of hours. Is that your recollection?

A. Yes.

Q. Now, this was held at Wells Fargo Arena; is that right?

A. Yeah.

Q. And when you go to the dance, do you have to go into the main area and sign in?

A. Yes.

MR. LIPMAN: Janice, are you referring to Hy-Vee Hall, not Wells Fargo Arena?

MS. THOMAS: I said Hy-Vee Hall. Yes. I meant Hy-Vee Hall.

MR. LIPMAN: Okay.

MS. THOMAS: Is she freezing up on you too?

MR. LIPMAN: A little bit, not much.

MS. THOMAS: Okay.

Q. So Katie, I was referring to Hy-Vee Hall, which is connected to Wells Fargo. Did you go to Hy-Vee Hall for the dance?

25

Q. You could just see their mouths moving?

A. Yes.

Q. And so then what happened after that?

A. Nevaeh had told me that she had felt uncomfortable, and she would like to leave the dance floor.

Q. Okay. And so what did you guys do?

A. We then left the dance floor.

Q. At that point in time, she just told you that she didn't feel comfortable; correct?

A. Correct.

Q. She didn't tell you that she thought that they were going to fight her, did she?

A. No.

Q. And did you ask her why she did not feel comfortable?

A. No.

Q. And who was out on the dance floor with you and Nevaeh?

A. Autumn and three guys.

Q. What's Autumn's last name?

A. Her last name is Sona, S-o-n-a.

Q. Does she still go to Roosevelt, Katie?

A. She never went to Roosevelt.

Q. Oh, okay. Where was she from?

26

A. Indianola.

Q. And how did you know her?

A. Through Nevaeh.

Q. Okay. So you guys leave the dance floor, and then what did you guys do?

A. She saw Mr. Dowler, and she had said she wanted to go tell him.

Q. Did you know Mr. Dowler?

A. I didn't have him as a teacher, no.

Q. Did you know who he was?

A. Yes.

Q. Do you know if Nevaeh had had him as a teacher?

A. She did.

Q. When she saw Mr. Dowler, where was he located?

A. I don't remember.

Q. Was he on the dance floor?

A. No.

Q. Was he upstairs?

A. No.

Q. Was he against the wall?

A. There were no walls.

Q. Was he against the windows?

A. There were no windows.

Q. Was he by the escalator?

A. No.

27

Q. Was he by the food?

A. I don't know.

Q. So she wanted to go to see him; correct?

A. Yes.

Q. And so did she go over to see Mr. Dowler?

A. Yes.

Q. And did you go with her?

A. Yes.

Q. And did your friend Autumn go with her?

A. No.

Q. And what did she do when she got over to see Mr. Dowler?

A. She had told him that she felt uncomfortable and that she felt the three girls were going to fight her.

Q. And then what happened at that point?

A. He had asked who, and she repeated, and he couldn't hear her, so he asked her to repeat. She repeated the three names.

He laughed and said "Good thing you are standing by me then," told her to stay away from them for the rest of the night, and then proceeded to ask her how her new school was going.

Q. Is that something that Nevaeh told you about that came out in the depositions?

A. No.

28

Q. You do understand that you are under oath; correct?

A. Yes.

Q. Now, Nevaeh told us that the fight occurred within a few minutes of her leaving the dance floor. Is that your recollection?

A. I don't remember.

Q. Why is it you remember some things but don't remember that?

A. Because this happened almost a year ago.

Q. So then what did you and Nevaeh do after she got done talking to Mr. Dowler?

A. She said she did not feel comfortable at the dance anymore. She said -- she asked if we could leave. I said sure. So we went over. We grabbed her shoes and her things that she had sitting on the coat racks that they had laid out.

I remembered that Autumn was coming to my house for the night. I told her that I'd be right back. I'm going to get Autumn.

She said "Okay. I'll be here when you get back," and I stepped away, and that's when Mya, Francine, and Shene kind of surrounded her.

Q. And you weren't there at that time?

A. I saw it happen, yes.

29

Q. Well, you said you stepped away.

A. But I was on -- kind of, like, if you're facing the dance floor, I was here. Nevaeh was here. The girls came this way.

Q. Okay.

A. So I still seen them coming.

Q. "Here" and "here" doesn't pick up on the record, so first of all, were you on the dance floor?

A. No.

Q. So you started to leave to go find your friend, but you could see the three of them go over to Nevaeh?

A. Yes, out of the corner of my eye.

Q. You couldn't hear anything they said, could you?

A. No.

Q. And it was loud because of the music; correct?

A. Correct.

Q. How far away were you from Nevaeh when she was speaking to Mr. Dowler?

A. I was right next to her, so maybe a couple feet.

Q. And the music wasn't causing any problem in you guys hearing what he was saying?

A. No.

Q. Is there any reason why you guys didn't go find the SRO, Officer Underwood?

A. Because she just wanted to get out.

30

Q. And after she was surrounded, what happened?

A. I kind of just froze where I was at, and I saw them talking about something. They were pointing at their phones again, and then they argued some more. Nevaeh had tried to walk away.

Then Shene pulled her hair back, kind of, like, started punching, scratching her, stuff like that, and then she kept trying to walk away but kept getting pulled back, and then Francine jumped in.

Q. Then did the fight get broken up?

A. By Mr. Dowler, yes.

Q. And where did you guys go?

A. Nevaeh ran upstairs. I followed with her stuff.

Q. And then what did you do?

A. Nevaeh went outside. I had asked a couple friends if they could stay with her in case she needed anything.

I went back downstairs, and I got Autumn, and then we left.

Q. And where did you guys go?

A. To my house.

Q. Did you go to Officer Underwood or the other officer that evening and tell them what had happened?

A. No.

Q. Did you go to any of the chaperones, teachers, or

31

administrators that were present and tell them what happened?

A. No.

Q. And you had gone upstairs and then gone all the way back downstairs and then gone back upstairs and didn't choose to discuss the matter with any adult; correct?

A. Correct.

Q. And then who picked you up that night?

A. My dad.

Q. And then what did you do when you guys got home?

A. We went to my room. We got more comfortable clothes on. We went back down -- we went downstairs. We watched a movie, went to bed.

Q. Did you tell either of your parents about what had happened?

A. Yes.

Q. When did you tell them?

A. Shortly after changing clothes.

Q. And who did you tell?

A. My mom and Nevaeh's mom.

Q. Well, Nevaeh's mom, was she there?

A. No.

Q. Okay. How about then did Nevaeh's mom come get her?

32

A. No.

Q. Did you guys ask Nevaeh if she felt that she was injured and needed to go to the doctor?

A. Yes.

Q. And what did she say?

A. She said no.

Q. No, she was not injured?

A. She said no, she didn't want to go to the doctor.

Q. Did she say that she was injured?

A. She said that her head had hurt. Her back hurt.

Q. Did she tell your mom that?

A. I don't remember.

Q. How is it that you remember those things but you don't remember if she told that in the presence of your mother?

A. My mother wasn't there.

Q. Well, where was your mom?

A. In Atlanta, Georgia.

Q. Okay. I thought you said that you talked to your mom. Did you call her on the phone?

A. Yes.

Q. So then let's see. What did you do the next day?

A. We got up. We packed -- they packed up their stuff, and they went home from what I can remember.

Q. And then do you know what, if anything, Nevaeh

---

**37**

A.  Yes.

Q.  Because the basketball season is after football season; correct?

A.  Correct.

Q.  And about how many games did she come to of yours?

A.  One.

Q.  And did you guys -- Strike that. Were you on the JV or varsity team?

A.  JV.

Q.  Did she and you go to any varsity games?

A.  One.

Q.  Do you have your affidavit in front of you?

A.  Yes.

Q.  Can you look at that?

A.  Yes, ma'am.

Q.  Can you go to page 2?

A.  Yes.

Q.  Paragraph 9, you said "I think Nevaeh told" -- Nevaeh -- I'm sorry -- "told Timothy Dowler, quote, I think these girls are trying to fight me, end quote," and Nevaeh listed the names of Mya Williams, Francine Cole, and Shene Lange; correct?

A.  Correct.

Q.  And is that all she said about the girls?

---

**38**

A.  From what I can recall, yes.

Q.  And I am sure when you heard that, you were probably surprised because you had never heard that before; correct?

A.  Correct.

Q.  And Nevaeh had never told you that before; correct?

A.  Correct.

Q.  And at that point in time, you guys didn't choose to go get the SRO or the officer -- or the other officer; correct?

A.  Correct.

Q.  Have you looked at the video of the fight?

A.  From that night?

Q.  Yes.

A.  Yes.

Q.  Do you have it on your phone?

A.  Yes.

Q.  How did you get it on your phone?

A.  I had seen it on Mya Williams' story.

Q.  And Katie, you have to help me there because I am not really --

A.  Oh, she had posted it on her Snapchat story.

Q.  Oh, okay. And then you get it, and then can you copy it and --

---

**39**

A.  I had, like, screen-recorded it, so I can, like, record it like a video but from her story.

Q.  Sure. And did you see that it was -- seemed like it was pretty quick --

A.  Yes.

Q.  -- Mr. Dowler broke it up; is that right?

A.  No. It was towards the end when Nevaeh was getting away more.

Q.  The fight didn't last very long, did it?

A.  No.

Q.  And when you were at Hy-Vee Hall, Nevaeh didn't tell you that she was hurt, did she?

A.  Not that I can recall.

Q.  And she wasn't bleeding, was she?

A.  Not that I can recall.

Q.  Then you went home that evening, and she wasn't bleeding, was she?

A.  I don't remember.

Q.  Well, let's take a minute and think about this. Was your friend bleeding at your house?

A.  Not that I can remember.

Q.  Did you go ask your dad to get any Band-Aids for your friend?

A.  Not that I can remember.

Q.  Did you go get any Band-Aids for your friend?

---

**40**

A.  Not that I can remember.

Q.  So you and her and Autumn stayed overnight at your house; correct?

A.  Correct.

Q.  And you guys changed, hung out, talked to your mom, talked to her mom, and watched movies; correct?

A.  Correct.

Q.  And Nevaeh did all those activities with you; correct?

A.  Correct.

Q.  Do you know anything about her aunt or something that had been in an automobile accident?

A.  Yes.

Q.  So tell me about that, what you know.

A.  She was on the phone with her mom talking about the fight. Her mom said "I know you have already had a bad night, but I don't want you to find out from anybody else."

And then she told her that she had died in an accident, and that's all that I know about it.

Q.  And had she died in an accident that night?

A.  From what I know, yes.

Q.  And where did that aunt live?

A.  I don't know.

Q.  Did she live in the area?

---

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION


KRISTY MITCHELL, Individually,  )
and As Mother and Next Friend   )
of NEVAEH OSORIO,               )
                                )
                                )
        Plaintiff,              )
                                )
-vs-                            )   CASE NO.
                                )   4:20-CV-00109-SMR-HCA
                                )
DES MOINES INDEPENDENT          )
COMMUNITY SCHOOL DISTRICT and   )
TIMOTHY DOWLER,                 )
                                )
        Defendants.             )
_____)

            ZOOM DEPOSITION OF FRANCINE WILSON

    Zoom Deposition of FRANCINE WILSON, taken on behalf of

the Defendants, before Sheila M. Cassady, Certified Shorthand

Reporter of the State of Iowa, on Tuesday, November 3, 2020,

at 2:00 p.m.

         SHEILA M. CASSADY - CERTIFIED SHORTHAND REPORTER

Q.   Okay.  Let me talk to you about the fight. Can you tell me what you remember happened that evening?

A.   Honestly, it was a long time ago, like a year ago. All I remember is my friends telling me, "Go talk to a bunch of boys, you know, like talk to them."

And all of a sudden, I hear Mya say, "Nevaeh is right there."  I didn't know they had a problem until -- the two sisters, I knew they had a problem with her, but I didn't know like it was -- I don't know.

And after that, all of a sudden, I just seen them arguing.

Q.   Let me stop you there for a minute.  You said you seen them arguing.  Was it Nevaeh and Mya?

A.   Yes.

Q.   Were they standing off the dance floor talking?

A.   Yeah.  It was off the dance floor.  It was like kind of like off the dance, but not really.  It was like behind like everybody.  It was out in the open.

Q.   Okay. And so you saw the two of them talking and it looked like they were arguing?

A.   No.  Actually, let me back up.  Let me backtrack.

Q.   Okay.

A.   Mya had told me -- she told me that she had talked to Nevaeh and kind of muffed her.  If you understand what that means?  She muffed her.  And then I wasn't there for

that part.  And that's when they went back and tried to talk to her and they grabbed me.  And then after that, I honestly don't remember like after that.

Q.   Okay.  So I'm not understanding you.  So you were standing there.  Mya came and got you?

A.   Uh-huh.

Q.   Is that yes?

A.   Yes.

Q.   And you went over to where Nevaeh was at?

A.   Yes.

Q.   And at some point in time, did a fight start?

A.   Yes.

Q.   And do you know who pushed who first?

A.   No.

Q.   Do you know if -- is it Shania?

A.   Shene.

Q.   Shene.  Did she pull her hair?

A.   Yes.

Q.   And then is that when the fight started?

A.   Yes.  I'm not going to lie.  Nevaeh was very unbothered.  Like she was, like -- at first, when like Mya had touched her at first, like she had muffed her, it was like done.  It was done.

She had like kind of grabbed and went back to it. Like, you know, I could tell that when Shene had muffed her

and pulled her hair, Nevaeh was like shocked.  Like she was like, "I'm bothered."

Q.   And then did the fight start?

A.   Yes.

Q.   Okay.  So then prior to this fight starting, did you know anything about an issue between Mya and Nevaeh?

A.   No.

Q.   All right.  And you wouldn't have gotten up and talked to any teacher or chaperone or anything because you didn't know about any issue going on.  Am I right?

A.   Yes.

Q.   And did you or Mya or Shene or Cameron say anything that would lead Nevaeh to think that you wanted to fight her?

A.   Yes.  I didn't say nothing.  Shene didn't say nothing.  But Mya and her -- I remember like after the whole conflict happened, they had showed me the messages of them arguing.  The two sisters, Cameron and Mya, were arguing with Nevaeh.  Me and Shene was just like, you know what, they had problems before, but I didn't know they was really arguing until after.

Q.   Okay.  Now, I'm going to stop you there.  I don't think you're understanding my question, which I should have told you, if you don't understand, tell me and I'll rephrase it.

A.    Yeah.  It was like very snatch, go, snatch, go, snatch, go.  So like one would go, you know, like back and forth, back and forth.

Q.    Okay.  And then do you know who came and broke it up?

A.    No.

Q.    So then -- was this sort of the end of the dance?

A.    Yes, like the last 10 minutes.

Q.    Then what happened after the fight happened?

A.    All I remember is Nevaeh going upstairs.  That's it.

Q.    Okay.  Then at some point in time, did you get in trouble at school?

A.    Yes.

Q.    Did you get suspended?

A.    Yes.

Q.    Mya told me she got three days' suspension?

A.    Yes.

Q.    Did you get three days' suspension?

A.    Yes.

Q.    Did Shene as well?

A.    I don't recall.

Q.    Then did you have any juvenile court proceedings?

A.    For probation.

Q.    Informal probation?

15

A.  Uh-huh.

Q.  Is that a yes?

A.  Yes.

Q.  So was there criminal charges filed, if you know?

A.  I think it was a assault.  That's what I think it was.

Q.  And that was to go through juvenile court?

A.  Yes.

Q.  And then you received informal probation?

A.  Yes.

Q.  Now, since the fight, have you talked to Nevaeh at all?

A.  No.

Q.  Have you seen Nevaeh at any Roosevelt event since this fight?

A.  No.

Q.  You have not?

A.  Huh-uh.

Q.  My statement is correct?

A.  Yes.

Q.  Mya had indicated she saw her at a basketball game or basketball practice.  Did you play basketball?

A.  No.

Q.  Have you had any other social media contact or in-person contact with Nevaeh since this fight?

Q.    I don't have anything Jeff?

Q.    [SKWROF] Jeff Francine do you us use the word that someone muffed Nevaeh?

A.    Uh-huh.

Q.    You used a hand against tour.  What does that mean?

A.    It's like I pushed her head like went like that (indicating).

Q.    You did that?

A.    No.  Mya did it to Neff never.

Q.    You pushed her head?

A.    Mya pushed Nevaeh head like muffed it that's when like the whole incident really started.

Q.    Okay.  Now, you mentioned that you went to enough I didn't like court is that right?

A.    Yes.

Q.    And you pled guilty to assault is that correct?

A.    Yes.

Q.    Okay.  And if we were to get the transcript of the proceedings at [SKWR*UF] nil court what do you recall you said because you would have had to say something that you did.  What did you tell the judge you did?

A.    Actually I was [-- | addition] I was in the fight also in the fight.  I kind of like I'm not actual I don't really remember, but I was like actual I was hand on [-- | addition] I

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION


KRISTY MITCHELL, Individually,  )
and As Mother and Next Friend   )
of NEVAEH OSORIO,               )
                                )
                                )
         Plaintiff,             )
                                )
-vs-                            )   CASE NO.
                                )   4:20-CV-00109-SMR-HCA
                                )
DES MOINES INDEPENDENT          )
COMMUNITY SCHOOL DISTRICT and   )
TIMOTHY DOWLER,                 )
                                )
         Defendants.            )
_____)

ZOOM DEPOSITION OF MYA WILLIAMS

     Zoom Deposition of MYA WILLIAMS, taken on behalf of the

Defendants, before Sheila M. Cassady, Certified Shorthand

Reporter of the State of Iowa, on Tuesday, November 3, 2020,

at 8:00 a.m.

SHEILA M. CASSADY - CERTIFIED SHORTHAND REPORTER

Q.   When Shene pulled her hair, how did Nevaeh respond?

A.   She had turned around and kind of pushed her off of her and that's when Shene went and hit her.

Q.   And then did Nevaeh hit her back?

A.   Yes, after Shene had hit her.

Q.   Okay.  And then my understanding, then, is that it got broken up; is that right?

A.   Yes.

Q.   And where -- was it pretty quickly that someone came to break up the fight?

A.   Yes.  Like some of the students and then --

Q.   Go ahead.  Some of the students and what?

A.   Some of the students kind of just like grabbed people away from me.  And then like -- then I think Mr. Dowler or somebody came later on, but like I didn't really get to see.

Q.   Okay.  And then what did you do after the -- that occurred?

A.   After that happened, I went and tried to like find everybody that had came with me because it was just like so chaotic.  And then it was just like, we need to go.  This is not where we need to be right now, like this whole bunch of chaos.

Q.   And was it at the end of the dance?

21

me and you and I was just trying to get that solved right then and there."

Is that you just trying to work out the situation with her and you and this boy?

A.    Yes.

Q.    So did you have some juvenile or criminal charges as a result of the fight?

A.    No.

Q.    Did -- you didn't have probation or anything of that nature?

A.    No.

Q.    Did you have to talk to the police?

A.    Yes.  They had to get a statement from me.

Q.    Okay.  Do you know if your -- either of your friends were charged in juvenile court?

A.    Yes.  But I wasn't sure like the result of that.

Q.    Okay.  Was it both of them or just one of them, if you know?

A.    It was both of them.

Q.    Is that because they had in fact struck her?

A.    Yes.

Q.    Were they friends with her?

A.    Not that I recall, no.

Q.    Then did you have any type of suspension or repercussions at school?

A.    Yes, I got suspended for three days.

Q.    And then after this fight occurred, did you see Nevaeh at any point in time after that?  And I'm not just talking about that day.  I'm talking about up to the present time.

A.    I had seen her at one of the basketball practices because her friend Katie played and she had came to like hang out with her after practice, and I seen her there.  But other than that, I haven't seen her.

Q.    So you saw her at a basketball practice at Roosevelt?

A.    Yes.

Q.    Were you playing basketball at the time?

A.    Yes.

Q.    And Katie was playing basketball so she came to the practice to watch and then meet with up with her afterwards?

A.    Yes.

Q.    Did you see her at any other time?

A.    No, I didn't.

Q.    After you exchanged these messages back and forth after the fight, have you texted her or Snapchatted her or done anything on social media with her since then?

A.    No.

Q.    And do you know if she lives in Iowa or if she moved

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

- - - - - - - - - - - - - - - -X
KRISTY MITCHELL, individually)
and as mother and next friend)
of NEVAEH OSORIO,                      )

                   )
          Plaintiffs,          )CASE NO.
                   )4:20-cv-00109-SMR-HCA
vs.                            )
                   )
DES MOINES INDEPENDENT         )
COMMUNITY SCHOOL DISTRICT and)
TIMOTHY DOWLER,                )
                   )
          Defendants.          )
- - - - - - - - - - - - - - - -X

          DEPOSITION OF TIMOTHY JOHN DOWLER,

taken via Zoom Video Conference by the Plaintiffs
before Kaylan R. McCord (Appearing via Zoom),
Certified Shorthand Reporter of the State of Iowa,
commencing at 10:00 a.m., Wednesday, August 5,
2020.

APPEARANCES:

For the Plaintiffs:    JEFFREY M. LIPMAN, ESQ.
                       (Appearing via Zoom)
                       Lipman Law Firm, P.C.
                       1454 30th Street
                       Suite 205
                       West Des Moines, IA 50266

For the Defendants:    JANICE M. THOMAS, ESQ.
                       (Appearing via Zoom)
                       Bradshaw Fowler Proctor &
                        Fairgrave, P.C.
                       801 Grand Avenue
                       Suite 3700
                       Des Moines, IA 50309

Witness:               Timothy John Dowler
                       (Appearing via Zoom)

   KAYLAN R. McCORD - CERTIFIED SHORTHAND REPORTER

Page 6

question because she can't take you both down at the same time.

THE WITNESS:  Okay.

BY MR. LIPMAN:

Q    Raise it up a little higher.  Okay. Thank you.

A    Uh-huh.

MS. THOMAS:  Hey, Jeff, are you going to want this as part of the transcript?  I'm just going to put an arrow on here and just put Dowler so we don't get it confused with Nevaeh's; okay?

MR. LIPMAN:  That's fine.

MS. THOMAS:  Thank you.

BY MR. LIPMAN:

Q    Mr. Dowler, can you please describe what your responsibilities were at the dance?

A    Just to monitor the -- you know, the dance floor, the area in general, just to make sure everything is running smoothly.  You know, I think the idea kind of was the more adult supervision there, the less trouble there would be.  So just having our physical body there, presence there was just to help prevent, you know, any trouble.  And so, I mean, you know, just kind of walk around, talk with the students, and just, you know, make

Page 7

sure everything is running smoothly.

Q    And were you familiar with Nevaeh Osorio prior to this dance?

A    Yeah, she was a former student of mine, and I would say we had a pretty good rapport.

Q    Now, at some point during the dance, do you recall having a conversation with Nevaeh?

A    Yes.

Q    And who was present during this conversation?

A    I think it was just she and I.

Q    Are you familiar with a student by the name of Katie Hirth, H-i-r-t-h?

A    I don't know her, no.

Q    Do you know if there was another student with Nevaeh when she had this conversation with you?

A    I'm -- I'm about positive it was she and I.  And the reason is, I can -- I can recall her walking toward me.  Because I said, "Hi, Nevaeh." And, you know, I think I prompted the hello, the greetings, and it was to Nevaeh and there was nobody else being introduced to me.

Q    Okay.  And where was Nevaeh coming from?

A    So -- yeah, so she would have been coming

Page 8

from the left of the escalator because I know I turned to my -- so she would have been to the left heading toward my X.

Q    So she was kind of toward the --

A    She would have been angled.  I would have -- if you want -- can I see that?

Q    Why don't you put an "N" where Nevaeh was when you first noticed her and draw an arrow toward where you were stationed when she was talking to you.

A    Okay.  So I have -- probably when I saw Nevaeh, again, there were a lot students so I wouldn't see her from afar.  You know, as she started approaching, probably somewhere here, so several feet away, and I would have been here.

Q    Okay.  So you've drawn the arrow from where you saw her to the direction she came to you at?

A    Yes.

Q    Okay.  And why don't you tell me about the conversation that you and Nevaeh had.

A    Yeah.  So as I saw Nevaeh, you know, I -- I think I smiled because I knew Nevaeh from last year.  I said, "Hello.  How are you?"  And within seconds into the conversation, I can tell you what

Page 9

I remember most vividly is her talking about Ankeny and her transition to the school, the new school, you know, how she liked it.  That part of the conversation stands out because I was very curious about Ankeny and just the whole transition.

It was toward the end that, yeah, she had mentioned that there was some kids that she wasn't getting along with or they didn't like her, but there was nothing, you know, real telling about any of that.  That would just -- in fact, I mean, that was -- to me was just an extension of very causal conversation.  I would characterize the whole conversation as being very causal, especially since we started out with Ankeny for probably a couple minutes.

Q    Okay.  Tell me exactly what you recall her saying about these people she was having trouble with.

A    All I can tell you is she didn't like them or they didn't like her.  It was nothing -- as I said, her demeanor was not alarming.  She was not showing great emotion.  In fact, I would say she was nonemotional, and I remember saying something to the effect of, "Well, just stay away from them," you know, kids don't get along with every kid in

Page 10

any building, so, you know, there was nothing like -- what I can remember is there was nothing alarming in the tone of voice. She was not hysterical. She was not, you know, crying. She was not showing any worry. I would describe the conversation as causal.

And when you asked about the individuals, I would still say it was a causal conversation about some kids she was not getting along with or she didn't like them or they didn't like her. It was that. I said something to the effect of, you know, "Just stay away from them."

Q    And do you remember which kids she mentioned she wasn't getting along with?

A    She may have mentioned the names, but here -- I don't know -- I didn't know the names. I didn't know the -- it just didn't mean anything to me. I -- I can't remember if she mentioned the names. But, again, to me it was still a causal conversation, still this extension of how is life, and -- so I just looked on this as she told me, yeah, how the homecoming is going.

Q    Okay. How did the conversation start?

A    I said, "Hello." I saw her coming toward me, and I think I prompted -- I think I prompted

Page 11

the greetings. And I don't know what took us into Ankeny. But that was, you know, "How is life?" I'm sure something like, "How is things going? How is life?" And with that she brought up Ankeny and next thing you know we were talking about Ankeny. And I can remember that because I had real curiosity about, you know, how life is in Ankeny, how she's doing, and how the school is. So that I remember very clearly.

Q    Okay. Did she at first tell you that she was having some problems with some other girls or did she first talk about Ankeny?

A    Ankeny.

Q    Okay. And then it led into she was having some problems with some of the girls at the dance?

A    Yeah. I can't tell you exactly -- I can't recall what led to that part because the whole conversation to me was just causal. You know, and in a causal conversation, you talk about multiple topics. And so to me that was just one more topic in our little conversation. Just bearing in mind, you know, during a homecoming as a teacher, you have many kids coming up to you and you have many little conversations. And because

Page 12

there was no stress in the voice, there was no alarm in the voice, I just looked on this as one more, you know, causal conversation.

Q    Do you recall what time the conversation took place?

A    No, I couldn't tell you that. You know, if you wanted me to make a guess, I would say somewhere in the middle of the homecoming, you know, but I -- I would not want to give you a time.

Q    Do you remember the incident or the altercation that Nevaeh had with these girls?

A    Yeah, because I broke up the fight. But at the time I did not know who was fighting.

Q    How much time had elapsed between your conversation with Nevaeh and the incident where she got attacked?

A    So I'm going to say -- I'm going to give you a fairly broad, 10, 15 minutes. Again, because the conversation didn't stand out, you know, so --

MS. THOMAS:  Just answer the question.

A    -- vividly.

THE WITNESS:  Okay.

BY MR. LIPMAN:

Q    Okay. You were going to say something. You can finish that.

Page 13

A    Well, just because it was -- again, it was a causal conversation, and when she left, somebody else came up, and you talk and it was just a while after that somebody, you know, came over and -- I think -- I'm not even sure how I knew there was fighting. I think somebody came over and told me there was fighting going on. But, yeah, I would gather somewhere between 10 and 15 minutes, and that's an estimate.

Q    And someone told you a fight was going on?

THE WITNESS:  It just logged off.

MS. THOMAS:  Oops, it did? You have to just touch it.

Are you there?

MR. LIPMAN:  Yeah.

MS. THOMAS:  Sometimes -- I don't know why this computer sometimes goes off.

MR. LIPMAN:  We can see you. Yeah, I can see you.

A    So, yeah, you know, when all this came up, I was trying to think how I did know. I'm pretty sure somebody came up and said, "There's fight over there." So I went -- I, you know, sprung into action immediately and went to the

IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| KRISTY MITCHELL, individually and as mother and next friend of NEVAEH OSORIO, | Case No. 4:20-cv-00109-SMR-HCA |
| Plaintiffs, | PLAINTIFFS' DESIGNATION OF EXPERT WITNESS |
| v. | |
| DES MOINES INDEPENDENT COMMUNITY SCHOOL DISTRICT and TIMOTHY DOWLER, | |
| Defendant. | |

COMES NOW the Plaintiffs, Kristy Mitchell, individually and as mother and next friend

of Nevaeh Osorio, by and through his attorney, Jeffrey M. Lipman of Lipman Law Firm, P.C.,

and hereby designates Craig A. Weatherall, Senior Police Officer, West Des Moines, Iowa,

Police Department, as Plaintiff's Expert Witness and includes as an attachment Officer

Weatherall's Statement and Resume in this matter.

*s/ Jeffrey M. Lipman*
Jeffrey M. Lipman AT0004738
LIPMAN LAW FIRM, P.C.
1454 30th Street, Suite 205
West Des Moines, IA 50266
Telephone: (515)276-3411
Facsimile: (515)276-3736
Jeff@Lipmanlawfirm.com
ATTORNEY FOR PLAINTIFF

Copy via email to:
Janice M. Thomas
Frank M. Swanson
thomas.janice@bradshawlaw.com
swanson.frank@bradshawlaw.com
ATTORNEYS FOR DEFENDANTS

On 25 September 2020, I received a 3-ring binder from Lipman Law Firm. This binder contained a variety of documents associated with a civil lawsuit—Mitchell and Osario v. Des Moines Independent School District and Dowler. The lawsuit stems from an incident on 05 October 2019 at Hy-Vee Hall in Des Moines, Iowa, during the Roosevelt High School Homecoming dance.

I have been affiliated with the West Des Moines Community School District for approximately 11 years, six of those being assigned as the School Resource Officer (SRO) at Valley High School. Every year—with the exception of 2019-2020 Prom—Valley High School sponsors two dance events at the Hy-Vee Hall complex. I frequently collaborate with Valley High School staff with overall safety of these events, and I attend all of them. The opinion I will give regarding this incident is based on my experience as an SRO as well as my familiarity with West Des Moines Community Schools policies and procedures at these events.

After reading the deposition transcript of Nevaeh Osorio, I understood the following: Nevaeh and her friend, Katie Hirth, arrived at Hy-Vee Hall on 05 October 2019. At approximately 10:00 pm, Nevaeh was assaulted by a group of girls—Mya Williams, Francine Hernandez, Shene Lang . Prior to that, Nevaeh was approached by these individuals on the dance floor. Nevaeh stated that she felt she was pushed in the back by one of these them. In addition to being pushed, the group yelled at Nevaeh. Because of the noise level on the dance floor, Nevaeh was not able to understand what they were saying. Nevaeh said she felt unsafe at this time. She then located Timothy Dowler—one of her former teachers. Nevaeh approached Dowler, and she told him the girls wanted to fight her. Dowler asked Nevaeh who she was referring to. Nevaeh pointed towards the girls and told him their names. Dowler responded to Nevaeh by telling her to go somewhere else. Feeling that Dowler would not do anything to help her, Nevaeh proceeded to the coat rack area to gather her belongings along with Katie with the intention of leaving the dance. As Nevaeh and Katie were leaving the coat rack area, Katie temporarily left Nevaeh to find another friend. As she did, Shene grabbed Nevaeh's hair and began hitting her. Soon after, Francine began hitting Nevaeh. After Nevaeh was separated from Shene and Francine, Mya hit her. Nevaeh then ran up the escalators and waited for Katie. The only adult, other than Dowler, at the dance that Nevaeh spoke to about the incident was a special needs teacher located in the upstairs area near the entrance. Nevaeh does not know the name of this teacher, and she only recognized her as a special needs teacher. Nevaeh left the dance shortly after.

After reading the deposition transcript of Katheryn (Katie) Hirth, I understood the following: Katie and Nevaeh were at the dance for approximately two hours. While on the dance floor, the above-mentioned girls approached Nevaeh. These girls began pointing to the screen of a cell phone and yelling at Nevaeh. Nevaeh then told Katie that she felt uncomfortable and wanted to leave the dance. Soon after, Nevaeh and Katie approached Dowler. Nevaeh told Dowler that she felt uncomfortable and felt these girls were going to fight her. Dowler laughed and told Nevaeh to stay away from them. Nevaeh then told Katie that she wanted to leave the dance. As Katie was beginning to find another friend at the dance, the girls surrounded Nevaeh. They then began to point to their cell phones and yell at Nevaeh. Shene then pulled Nevaeh's hair and punched her. Soon after, Francine joined the assault. Eventually the altercation was broken up by Dowler. Nevaeh then left the dance floor. Katie stated that she never talked to an adult at the dance about the altercation, nor did any member of school administration contact her at school the next week to discuss the situation.

After reading the deposition transcript of Timothy Dowler, I understood the following: Nevaeh approached Dowler midway through the dance. Dowler recognized Nevaeh as a former student, and he knew Nevaeh transferred to the Ankeny School District. Dowler stated he and Nevaeh had a very casual

conversation, and most of it was about Nevaeh's transition to Ankeny School District. At some point in their conversation, Nevaeh disclosed to Dowler that the she and the above-mentioned girls did not like each other. After hearing that, Dowler told Nevaeh to stay away from them. Dowler described the conversation as "casual." Dowler does not remember if Nevaeh disclosed the names of these girls. Dowler stated that Nevaeh did not show any emotion, and her demeanor was not alarming. Approximately 10-15 minutes after this conversation, Dowler was made aware of a physical confrontation approximately 50 feet from where he was standing. Dowler approached the altercation and broke it up. Dowler did not know Nevaeh was part of the fight. After breaking up the fight, Dowler left the dance floor to seek assistance for fear that another altercation would start. Dowler did not speak to school administration about incident until the following Monday, and that is when he was made aware that Nevaeh was part of the fight he broke up.

School functions at any level—especially high school—can be very demanding. Organizers must take many things into consideration such as budget, security, venue, refreshments, decorations, DJ, parent volunteers, and many other logistical challenges. School dances bring in an enormous number of attendees—sometimes in the thousands. The people organizing these events begin the planning stage 9-12 months out. A lot of planning goes into these events to provide a fun and safe environment for attendees. With that in mind, though, occasional mishaps and unfortunate incidents do happen. There are some situations that cannot be predicted and fully prevented.

The dance atmosphere at Hy-Vee Hall is not conducive to detecting and preventing harassing situations that might lead into physical confrontations. There are a lot of people dancing, socializing, taking pictures, etc. The music is generally loud, and one must sometimes yell for the other person to understand what is being said. The lighting is dim, and I typically must use my flashlight to efficiently navigate while walking throughout the dance floor area during my course of duties at these events.

To speak specifically about supervision at an event like this, there are many groups represented—school administrators, police officers, private security possibly, teacher volunteers, event organizers, and parent volunteers. Each one plays a unique role, but ultimately their mission is to ensure a safe, engaging, and fun environment.

When dealing with a violent—or potentially violent—situation, all groups represented must follow protocol to effectively handle the situation. Some people in the chaperone group—such as parent volunteers—must never intervene in a dangerous—or potentially dangerous—situations. They are merely a presence on the dance floor, a safe person to approach with a problem, and help with logistical issues. Others, such as police officers, are required to intervene in these situations.

Regardless of responsibility level, school administration must be informed of any type of situation in which there is a reasonable chance that someone might get hurt or is being harassed. From there, they should investigate the allegation to determine the proper course of action. The investigation should include identifying all parties involved, interviewing those people, and develop that maintains everyone's safety to the best of their ability. While many investigations do not go exactly as planned, school administrators must make every reasonable effort to get to the bottom of the situation.

School employees, such as Dowler, have a responsibility to report situations where there is a reasonable chance that someone might get hurt or is being harassed. As a school employee, violations of school policy at school-sponsored activities—regardless of venue—must be reported to administration within a reasonable time depending on the situation at hand. If the situation details a possible imminent

physical altercation, the school employee must make every effort to keep the student safe and report the allegation to school administration. Keeping the student safe will look different, depending on the situation. For example, it might be appropriate to remove the student and escort that person to a different section of the room. It might be appropriate to stand next to the student until another employee can intervene.

In this case, there appears to be different accounts between Dowler, Nevaeh, and Katie. Nevaeh and Katie state that Nevaeh clearly told Dowler that the girls wanted to fight Nevaeh. After disclosing this information, Nevaeh stated that Dowler told her to go somewhere else. Katie stated that Dowler told Nevaeh to stay away from the girls. Dowler stated that Nevaeh told him that she and the girls do not like each other, and there was never verbiage indicating that Nevaeh was in danger or anyone was harassing her. Because of that, Dowler felt it was enough to tell Nevaeh to stay away from the girls.

If the details of this incident presented by Nevaeh and Katie are accurate, Dowler had the obligation to inquire more about Nevaeh's allegations, escort her to a member of school administration, and assist with the investigation as the administration sees fit.

If the details of this incident presented by Dowler are accurate, Dowler should have inquired more as to what Nevaeh was saying—casual conversation or not—at a minimum. If a student comes up to a chaperone and states something like "He doesn't like me, and I don't like him.", there should be at least curiosity as to the context of that statement. In other words, why did that person just say that? By inquiring more into a comment like this, that questioning will help guide the chaperone on the proper course of action.

In my opinion, a student telling a chaperone that he/she does not like someone, and the feeling is mutual, does not trigger a notification to administration. There are many contentious relationships in school environments. School officials are aware of some of them, but many times they are not. Administration does not have the duty to investigate a situation solely based on someone not liking another. However, if a student makes it a point to report this type of information to an individual in an official school employee capacity, a reasonable person could expect that more inquiry into the comment is warranted. After the inquiry and the information given appears to be harassing in nature, that employee has an obligation to intervene and report the information to the appropriate person.

As part of the 3-ring binder, a copy of the Roosevelt High School 2019-2020 handbook was presented to me. I reviewed the Roosevelt handbook, and it appears to be similar to the Valley High School 2019-2020 handbook. After reading the Roosevelt handbook, it clearly lists the procedures for reporting bullying and harassment behavior; furthermore, it lists the appropriate steps to take to investigate these claims. The handbook also details the responsibility of school employees in reporting these incidents.

The opinions expressed herin are accurate within a reasonable degree of certainty within my profession.

_____#194_____                                    10-2-2020
Officer Craig Weatherall                                  Date
West Des Moines Police Department



# 2019-2020

4419 Center Street
Des Moines, IA 50312-2299
Phone: 515-242-7272   FAX: 515-242-7350

**Kevin Biggs, Principal**
**Mindy Euken, Associate Principal**
**Jeff Hummel, Associate Principal**
**Matt Lakis, Associate Principal**
**Carrie Romo, Associate Principal**

**Tracy Johnson, Activities Manager**
**Sophal Vann, Building Manager**
**Nicole Cable, Nurse**
**Janet Stonerock, Bookkeeper**
**Dona Adcock, Executive Secretary**

## WELCOME

Roosevelt Roughriders, welcome to the 2019-20 school year! For more than 90 years, Roosevelt High School has built a tradition of excellence — in academics, fine and applied arts, athletics and activities. You are now a part of this tradition. We not only believe in you, but also will assist you in achieving your full potential.
Do not settle for anything less!
*Success for Every Student!*

## At Roosevelt, We:

# T
**THINK CRITICALLY**

# R
**REFLECT**

# H
**HONOR**

# S
**SURPASS**

1

**PApp 41**

DMPS 29

# TABLE OF CONTENTS

| TITLE | PAGE |
|---|---|
| Fight Song | 3 |
| TRHS and Central Schedules | 4 |
| Administration Team | 5 |
| Student Support Center/Counseling | 6 |
| Graduation Requirements | 7 |
| School Dances | 7 |
| Attendance | 7 |
| Dress Code | 11 |
| School IDs | 11 |
| Equity/Non-Discrimination Policy | 11 |
| Student Discipline & Conduct | 11 |
| Lockers and Locks | 27 |
| Lunch | 28 |
| Parking | 28 |

## Equity Statement

It is the policy of the Des Moines Community School District not to illegally discriminate on the basis of race, color, national origin, sex, disability, religion, creed, age (for employment), marital status (for programs), sexual orientation, gender identity and socioeconomic status (for programs) in its educational programs and its employment practices. There is a grievance procedure for processing complaints of discrimination. If you believe you have (or your child) has been discriminated against or treated unjustly at school, please contact Susan Tallman, interim Chief of Human Resources, 2100 Fleur Drive, Des Moines, IA 50321; phone: 515-242-7709 or email: susan.tallman@dmschools.org.

**PApp 42**

DMPS 30

# PROJECTED CREDITS EARNED TO GRADUATE IN FOUR YEARS
## Graduation Requirements for 2019-20

A total of 23 units of credit will be required for graduation, including Physical Education. Each year-long class is worth 1.0 credit. Each semester-long class is worth 0.5 credits.

| | |
|---|---|
| Social Science | 3 credits: 20th Century World History (1.0), U.S. History (1.0), Government (0.5), Economics (0.5) |
| English | 4.0 credits |
| Mathematics | 3.0 credits |
| Science | 3.0 credits |
| Applied/ Fine Arts | 1.5 credits |
| Physical Education | 0.5 credits each school year |
| Electives | 7.5 credits (Must include one financial literacy course) |
| Total | 23 credits |

Students have the opportunity to select from a wide- range of over 150 course offerings. A complete list of our courses offered at TRHS and Central Campus/Academy is available in the Student Support Center or on the Roosevelt website under the 'Counseling'. See your school counselor for advice.

# SCHOOL DANCES

It is hoped that students will participate in all school dances, as these activities provide great opportunities for students to have fun and to get to know each other. **Dance tickets are sold only at school to Roosevelt students who have a <u>current</u> TRHS ID. Students must have all administrative obligations met to attend dances.** Tickets will only be sold Monday through Thursday the week of the dance. **No tickets will be sold the Friday of the dance or at the door.** To enter the dance, **students must have their <u>current</u> TRHS ID and a ticket, if issued.**

Students may bring a guest if they have purchased a guest ticket and register their guest. To register guests and purchase guest tickets, students must complete and submit a "Guest Request Form" to the associate principals' office no later than 3:45 p.m. the Thursday prior to the dance. The form is available for pick up in the associate principal or main offices. Guests must accompany the Roosevelt student who registered them for the dance and have a photo ID along with their ticket. **Guests may not be middle school students, nor may they exceed the age of 20, for any school dance, including senior prom. All students are expected to exit the dance venue immediately at the end of the dance, securing transportation home before entering the dance.**

# STUDENT ATTENDANCE

*The Des Moines Public Schools student attendance policy is created based on the belief that all families value the importance their child's education. Through a meaningful partnership with schools and consistent communication, together we can overcome obstacles that impact regular school attendance.*

Attendance is the foundation for learning and achievement. When students attend class regularly, they are exposed to fundamental reading and math skills and build habits of good attendance that carry them into the next stage of their life. Des Moines Public Schools is committed to working with students, families, and the community to ensure each student's personal and academic success.

7

DMPS 35

1

UNITED STATES DISTRICT COURT
THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION


KRISTY MITCHELL, individually )
and as mother and next friend )
of NEVAEH OSORIO,              )
                               )  Case No.
          Plaintiffs,          )  4:20-cv-
                               )  00109-SMR-
          -vs-                 )  HCA
                               )
DES MOINES INDEPENDENT         )
COMMUNITY SCHOOL DISTRICT and )
TIMOTHY DOWLER,                )
                               )
          Defendants.          )
-----------------------------)


     DEPOSITION OF CRAIG WEATHERALL, taken via
Zoom, commencing at 4:40 p.m., November 9,
2020, before Michele L. Proesch, Certified
Shorthand Reporter of the State of Iowa.

                  APPEARANCES


JEFFREY M. LIPMAN, of the Lipman Law Firm,
P.C., 1454 - 30th Street, Suite 205, West
Des Moines, IA  50266, appeared on behalf of
the Plaintiffs.


JANICE M. THOMAS, Bradshaw, Fowler,
Proctor & Fairgrave, P.C., 801 Grand Avenue,
Suite 3700, Des Moines, IA 50309, appeared
on behalf of the Defendants.


          Michele L. Proesch, CSR, RPR, CRR
             Veritext Legal Solutions
                  800-567-8658


**PApp 44**                              **Ex. 8**

2

                              INDEX

Witness                 Attorney              Page

Craig Weatherall    Ms. Thomas                 3

                    Mr. Lipman                 34

                           STIPULATION

    MR. LIPMAN:  Should we do the standard

COVID stipulation?

    MS. THOMAS:  That we're taking this via

Zoom and the court reporter's not with the

deponent?

    MR. LIPMAN:  Yep.

    MS. THOMAS:  Okay.  Fine.

    MR. LIPMAN:  Okay.

**PApp 45**                                    **Ex. 8**

3

PROCEEDINGS

CRAIG WEATHERALL,

witness herein, called as a witness by the
Defendants, after having been first duly
sworn, was examined and testified as
follows:

EXAMINATION

BY MS. THOMAS:

Q. Sir, could you please state your full name?

A. Craig Alan Weatherall.

Q. Officer Weatherall, my name is Janice Thomas, and I'm here today to take your deposition concerning a report that you offered. Have you had a deposition taken before?

A. Yes, I have.

Q. All right; so you know the rules, but I just remind you, especially today since we're doing this via Zoom, it's hard for the reporter to take us both down at the same time, so try to let me finish my question before you answer. Also, if I ask a question you don't understand, tell me you don't understand it, and I'll be more than happy to rephrase the question. I don't

4

anticipate your deposition's going to take very long, especially since I have a 4:30 phone conference, so -- but if you want to take a break, let me know, all right?

A. Yes, ma'am.

Q. Okay. Now, I have your CV, and it looks like you have been a West Des Moines police officer since 2004; is that correct?

A. Yes, ma'am, July of 2004.

Q. And then you're currently still one; correct?

A. Yes, I am.

Q. And then you also are a school resource officer, also known as SRO?

A. That's my current position, yes.

Q. So tell me how that works. Are you a West Des Moines police officer and then you get assigned to just be the SRO?

A. Yes, so I'm -- I'm employed with the City of West Des Moines as a police officer, and my duty within the department is school resource officer at Valley -- at Valley High School.

Q. Do you ever go out on calls then or do you just do the SRO job?

5

A. The call -- Well, yes, the calls I do go on are typically school-related, like home visits, welfare checks, things of that nature on behalf of the school.

Q. So how long have you been the SRO for Valley High School?

A. So this is my second stint. I was a school resource officer from -- well, from 2018 till now and then before that I was -- from 20- -- I want to say from 2014 to 2017, and I took a year -- I took a year break, went back to patrol, and then came back to be the SRO.

Q. And were you at Valley High School from 2014 to 2017?

A. Yes.

Q. And do you just do Valley or do you do -- what's that ninth grade building called?

A. Valley Southwoods? So myself and another SRO, we are assigned I guess technically to the West Des Moines Community School District with -- and my primary duty is Valley High School and then my partner's primary duty is Valley Southwoods, the freshman high school you just referred to,

6

as well as Walnut Creek Alternative School and then between he and I we have responsibilities at all the elementary schools for West Des Moines.

Q. Okay, so I assume you went through the police academy; correct?

A. Yes, I went through the Des Moines Regional Academy.

Q. And do you know Mr. Lipman from his children attending Valley High School?

A. Yes.

Q. Okay, and then --

A. I've known --

Q. Go ahead.

A. I'm sorry. I guess I've known him before that just with he being a judge on -- for -- during at the time traffic court.

Q. Okay. From his magistrate position?

A. Yes.

Q. So I've looked at your CV, and I don't know if you have it there in front of you --

A. Uh-huh.

Q. -- but in looking at the professional development you've done, as it relates to a school resource officer, is that the school

PApp 46

Ex. 8

7

resource officer basic training course?

A. Yes, ma'am.

Q. And then is there any other course that relates specifically to a school resource officer?

A. It's not listed on my resume; I mean, I have been to -- I guess I don't know how many off the top of my head, but, you know, a few, I would say three or four probably annual conferences that the -- that the State puts on through the association.

Q. And it's just dealing with school resource officer training or what?

A. Yeah, it's called the Iowa -- NASRO, the National Association of School Resource Officers, the Iowa chapter.

Q. Yeah. And I noticed on their website they have like an annual thing every year; is that right?

A. They try to, yes, ma'am.

Q. And did they have one this year?

A. No, they did not.

Q. Did you go last year?

A. Yes, I did.

Q. So how many times do you think that you have

8

gone to that training?

A. I would say three or four.

Q. Okay; and then this -- the school resource officer basic training course, do you have an outline from that?

A. I do not, no.

Q. Is that put on by the National Association of School Resource Officers?

A. I believe so. I -- I'm not -- I'm not on their board of directors. I -- I presume that their curriculum is from the national organization. The instructors for that school come from all over the nation, so I would presume so.

Q. When did you take this basic course training?

A. 2014 is my -- is -- I presume.

Q. And how long was the course training?

A. One week, I believe.

Q. Was it like a 40-hour coursework?

A. Yes, ma'am.

Q. And do you remember what they discussed at that time?

A. Well, a wide variety of things, so I'm in front of my computer. I can tell you, yes,

9

so on March 17th through 21st in 2014 is when the -- is when I took the course, and it was held in Johnston, the city of Johnston, one of the buildings over there for the school. As far as -- Did you ask me about the curriculum? Is that right?

Q. Yes.

A. Well, there is -- there is a lot to it. From what I can remember the curriculum entailed general security guidelines; it talks -- they talk a lot about outreach opportunities; they talked about children behavior; they talked about what we call IEPs, Individual Education Plans. Off the top of my head that's what I can remember from their curriculum.

Q. All right, and then other than that and the annual training that you've gone to that's all the training you have had as an SRO; correct?

A. For specific SRO duties I would -- I guess I would say so.

Q. Now, how many dances have you chaperoned?

A. Well, so I have been at all the dances from, what, 2014 through this year with the

10

exception of one year, so, what -- so I go to both prom and -- The main dances that -- that I have been affiliated with are prom and homecoming and then I believe three of those years they also have what they called a sweetheart dance, so I would say just a ballpark number 12 to 15 dances altogether is my guess.

Q. Okay. When you go to those dances, do you wear your uniform?

A. I do, yes.

Q. And even though you're the SRO there, is there someone else who accompanies you to those dances?

A. Typically my -- the other SRO for the schools, he usually accompanies me, yes.

Q. And does he wear his uniform as well?

A. Yes.

Q. And what's the purpose of you guys wearing your uniform?

A. Well, we're -- we're there for general security, and so there is safety involved with -- because of the stuff that we carry on our belt, you know, that in case there is a use of force incident that we have those

PApp 47                     Ex. 8

11

Q. tools readily available for us. It shows a presence of security there, and it's -- well, it's just the uniform that's been dictated by -- by our department as well.

Q. But you would agree the fact that you're there in your uniform shows the presence to the students that there is an officer there on duty?

A. 100 percent, yes.

Q. All right. Okay. In your report you talked about some documents that you reviewed, and I don't know if you have your file material with you.

A. So, yes, I --

Q. Well, first of all, do you have your file material with you?

A. Yes, ma'am.

Q. Okay, so can you tell me what you have reviewed?

A. So I was -- I was given a three-ring binder that had various documents in it, depositions from various people and then there was also -- there are some pictures it looked like from social media, as well as it looks like a copy of the -- the school --

12

the Roosevelt policy handbook, the 2019-2020 handbook.

Q. Did you get the handbook? Correct?

A. Yes, ma'am.

Q. Okay. Can you tell me what depositions you have reviewed?

A. I've reviewed -- let's here, let me make sure I get it, so Catherine first, Tim -- Timothy Dowler, Nevaeh Osorio, and then I also reviewed a deposition from Officer Underwood from the Des Moines PD.

Q. And is that it?

A. I believe so.

Q. Now, when you're at the dance wearing your uniform or the other officer is wearing his uniform at a dance, if a student felt that they were in danger, you would expect that they could come talk to you; correct?

A. We are one of the people that we could expect them to talk to, yes.

Q. All right. Now, in this particular matter -- or strike that. Let me ask a couple other questions. Have you talked to anybody other than Mr. Lipman about this case?

13

A. My wife.

Q. Okay, but you haven't talked to Mr. Dowler; correct?

A. Correct.

Q. You haven't talked to Nevaeh Osorio, have you?

A. I have not.

Q. And you have not talked to her mother, have you?

A. I have not.

Q. And did you read her mother's deposition?

A. I believe so. I believe -- I believe I did.

Q. Have you ever authored any publications, articles concerning any of the issues similar to this case?

A. No, ma'am.

Q. And is the report that you prepared and signed -- is that the only report that you've prepared?

A. For this case, yes, ma'am.

Q. And you don't have any other photographs or videotapes other than what you talked about, have you?

A. That's correct.

Q. Have you been an expert in any other cases

14

in the last four years?

A. No, ma'am.

Q. Have you ever been retained to be an expert?

A. I have not.

Q. Have you -- How much are you charging for this case?

A. $100 an hour.

Q. And how much time have you put in on this case?

A. I believe eight hours.

Q. And have you billed for that?

A. No, I haven't.

Q. Okay. Now, as it relates to this case, Nevaeh Osorio, is it your understanding she was not a student at Roosevelt at the time of this dance; correct?

A. Yes, ma'am.

Q. And at the time of the dance she was not being provided any educational programs, was she?

A. Not that I'm aware of.

Q. And she was not there --

A. (Inaudible.) Go ahead, I'm sorry.

Q. She was not there in an academic environment, was she?

PApp 48

Ex. 8

15

A. Okay. I'm sorry, so can you repeat those two questions again?

Q. Well, she wasn't there on an educational program, was she?

A. No, she was not.

Q. All right; and she was not participating in an academic program, was she?

A. Not at Roosevelt High School, no.

Q. She didn't attend Roosevelt High School at the time of this dance; correct?

A. That's my understanding.

Q. Okay. Now, I assume -- You have been an SRO for a number of years, and I assume you would agree and you've probably encountered a number of contentious relationships between students. Would I be correct on that?

A. Throughout my time as an SRO I would say that's correct.

Q. And have you also found that that can come about amongst girls quite frequently?

A. Yes, ma'am.

Q. All right; and in a school situation where someone -- you're in the school and there is an issue concerning two girls that like a

16

boy, is that something that you get involved in or is that typically something like the counselor or someone at the school handles?

A. I guess it just kind of depends. Some things are brought to my attention and some things are not.

Q. If someone's just talking about a boy who they like; I mean, they don't want the other person talking to them about it, is that something that they would really call on you to get involved in?

A. I would say no.

Q. All right. In school situations I assume that you've encountered many times when students do not like each other; is that right?

A. Yes, ma'am.

Q. Okay; and, again, would you also agree that every time that that occurs you can't expect a teacher or a staff personnel to investigate when someone says they do not like someone?

A. Not necessarily.

Q. Every time -- Every time someone says they don't like somebody, you think a teacher or

17

a staff member should investigate that?

A. It depends on this -- this -- the atmosphere, the -- It can depend on a few things, I suppose, but just the fact that someone doesn't like somebody else in and of itself is not -- does not trigger an investigation, I wouldn't say, no.

Q. Now, in this particular case you have authored a report, and I've kind of looked through it, and it looks like you read the depositions, and you would agree that there are kind of two sides to the story as to what actually occurred; am I correct?

A. Yes, ma'am.

Q. And those two stories come from Mr. Dowler, being the first person; correct?

A. He's one side of the story, yes, ma'am.

Q. And then the other side of the story comes from Nevaeh Osorio and her friend Katie Hirth; correct?

A. Yes, ma'am.

Q. In looking at your opinion it looks to me like if you take Mr. Dowler's report as to what occurred, you would agree that his rendition of what occurred, the conversation

18

was casual, correct --

A. What --

Q. -- between him and -- between him and Nevaeh?

A. Well, that's what he stated.

Q. All right; and in looking at your opinion in this matter what he stated that you're opining on is that she came up to him and said something to the effect "He doesn't like me, I don't like him"; correct -- or, I'm sorry, strike that; that he said somebody doesn't like her there.

A. Yes, that's what she said -- or -- yes.

Q. That's what he said; correct?

A. Correct.

Q. And your opinion is that he should have inquired into the context of that statement?

A. Correct.

Q. In fact, your report says you should -- he should have said, "Why did that person just say that?" Am I -- Is that your opinion?

A. Yes.

Q. All right. Now, in that scenario Mr. Dowler did not state that Nevaeh reported to him a comment that someone had made; correct?

19

A. Yeah, the comment to him was "They don't like me" or "She doesn't like me", yes.

Q. Okay, so that's not someone making a statement to him that somebody said they don't like him -- her, that per- -- her; correct?

A. Well, so that -- No, that's not a -- I guess I don't know exactly what -- what the question is.

Q. Well, you just said that if a person says, "Why did that person just say that?", there should be more inquiry, but in this particular scenario there was no -- Nevaeh didn't say that the -- anybody said anything to her. She just stated that someone didn't like her. Am I correct on that?

A. Well, that's correct; however, I'm going to -- I'm going to just say that -- that that's -- that's not a typical comment to -- I mean, that's -- that's not a comment that is frequently -- Like people don't go around saying, "Oh, he doesn't like me" or "She doesn't like me." Like, that's not -- that's not common. That's not a normal, you know, conversation. If somebody comes up to

20

me and said -- and they make it a point to say, "Hey, Officer Weatherall, that person doesn't like me", there -- that's -- that's not typical, that's not normal unless something's really wrong or someone's feeling a certain way, so -- so my -- my initial reaction is -- is going to be, "Well, what do you mean they don't like you? Why are you saying it?" Like, there is at least a follow-up question as to why that person's saying that, and I would say that if somebody went up to anybody in that position, I think it would be -- I think that's just -- that's just not typical conversation to start -- to start off with.

MS. THOMAS: Move to strike the answer as nonresponsive to the question.

Q. All right. Sir, your report, though, doesn't say that. Your report specifically says that it was a statement, so now you're turning this around and putting other words into it; is that correct?

MR. LIPMAN: I'm going to object as being argumentative and is not consistent with the testimony.

21

MS. THOMAS: He can answer.

Q. Your report says "statement", does it not, sir?

A. So I'll just read you my report. It says, "If the details of this incident presented by Dowler are accurate" --

MS. THOMAS: Move to -- Move to strike. This is nonresponsive to the question. Answer my question, sir. Do you need the reporter to read it back? She can read it back. This is a yes or no question.

MR. LIPMAN: I'm going to object as being argumentative and badgering at this point. He's reading you what he said in his report. That's what you asked of him.

MS. THOMAS: I did not ask him to read his report. Can you read back the question for him, please?

(The requested portion of the record was read by the reporter.)

MR. LIPMAN: Same objection.

A. I don't believe I'm doing that.

BY MS. THOMAS:

Q. All right; so -- and then, again, sir, earlier -- It's your testimony -- So if I'm

22

reading your report correctly, it's basically because she stated that some people don't like her, that what Officer -- or, I'm sorry, what Mr. Dowler should have done was make further inquiry. Am I correct on that?

A. Yes, ma'am.

Q. And in your report you say, "there should be at least curiosity as to the context of that statement. In other words, why did that person just say that?" Correct?

A. Yep; yes, ma'am.

Q. All right; and so your criticism of Mr. Dowler is that when this statement was made to him in the context as he reported it, that what he should have done was made further inquiry; am I correct?

A. Correct.

Q. All right, so do you know what the two girls were disputing or fighting about -- Well, strike that. Let me rephrase it. Do you know what the two girls were arguing about?

A. Well, it appears that they were -- there was some type of -- I don't know if you'd call it disagreement. One girl was apparently

PApp 50   Ex. 8

23

involved in a -- some type of friendship or -- I don't know what you want to call it over -- with this boy over Instagram, and one of the other girls didn't like that, if I'm understanding this correctly.

Q. And then if further inquiry would have been made of that based upon the deposition testimony that you have read, you would have -- it would have been that she would have reported the disagreement with the other girl about the guy; correct?

A. Well, I don't know what would have been said upon further inquiry. I'm guessing a little more detail about why she would make a comment like "Those girls don't like me." There might be more inquiry, so I would say that, you know, again, I don't know what would, you know, come from that conversation, but I think there would have been a little more clarity as to what was going on at the present time and what further action needed to be had.

Q. Okay, and so that is the extent of your opinion as to what Mr. Dowler should have done if you take his story; am I correct?

24

A. Well, again, ma'am, look, again, depending on what was said, I mean, that could trigger -- that could trigger a number of things, but from what -- you know, from what he -- you know, she goes up to him and says that, and there is no inquiry, so I can't -- I mean, it's hard for me to speculate what would happen from there, but, again, a little more clarity into what the situation was.

Q. All right; so I just want to make sure that I have it clear as to what your opinion is and what you're going to testify as it relates to Mr. Dowler. Again, relating to Mr. Dowler's rendition of what occurred, if we believe that, then your only opinion is he should have made further inquiry as it relates to him -- his actions. Am I correct on that?

A. Yes.

Q. Okay; and then if we go to the next step, sir --

A. Uh-huh.

Q. -- to the other scenario, which is Nevaeh and her friend's story -- Oops, sorry, I

**PApp 51**

25

lost my sheet. As it relates to Nevaeh and her friend's story, Katie, if that was accurate, am I correct, again, one of your opinions is that he should have made further inquiry?

A. Correct.

Q. And then you think that he should have escorted her to a school administration to assist with an investigation; correct?

A. Well, not necessarily. It depends on what was said.

Q. Okay, so if you could go to your -- Do you have your report, page 3?

A. Yes, ma'am.

Q. If you'd go to the paragraph that starts "If the details of this incident".

A. Okay.

Q. And do you just want to read that to yourself?

A. Okay. Okay, got it.

Q. All right; so the first part, he should have made more inquiry about her allegations, Nevaeh's; correct?

A. Yes.

Q. And then in your report you said he should

26

have escorted her to a member of the school administration to assist with the investigation, but what you're telling me is that may not have been necessary.

A. Well, I'm sorry, I -- I think I -- I did not understand the question fully. So based on the information that Nevaeh is stating she told him, I would say the appropriate action would be to inquire a little more and to get somebody with the -- within the administration on board with -- with what was going on.

Q. And then that administration person can make a determination as to whether or not an investigation was fit -- was appropriate at that time.

A. Yes.

Q. And what statement was made to Mr. Dowler by Nevaeh that you believed triggered him to make further inquiry and take her to a school administrator based upon her story?

A. When she told him that those -- that pointing towards these group of girls in question and saying that they wanted to fight her.

**Ex. 8**

Case 4:20-cv-00109-HCA   Document 36-3   Filed 03/08/21   Page 52 of 54

Mitchell vs. Des Moines Independent Community School District, et al.                Craig Weatherall

27

Q. All right. Have we now talked about all the opinions that you have under both scenarios, sir?

A. I think so.

Q. All right. I mean, the majority of your report is just kind of summarizing what you read; correct?

A. Yes, ma'am, I would say so.

Q. All right. I mean, I don't need to go through that. We can read that. Let me ask you a couple other questions.

A. Uh-huh.

Q. But it is also your opinion that merely because a student tells a chaperone that someone doesn't like 'em, it does not trigger a notification to administration; correct?

A. That's correct.

Q. And you would also agree that there are many contentious relationships in school environments; correct?

A. Yes, ma'am.

Q. And an administration does not have a duty to investigate a situation solely based upon the fact that somebody doesn't like

28

somebody; correct?

A. I would say that's an accurate statement, yeah.

Q. So after this scenario -- So you're aware that a fight did eventually occur; correct?

A. Say that one more time.

Q. You're aware that a fight did actually occur then.

A. A physical altercation occurred, yes.

Q. All right. Do you know how much or do you have an understanding as to how much longer after this conversation that this altercation occurred?

A. I don't have a -- Well, so I guess, no. Mr. Dowler says I believe 10 or 15 minutes. I think Nevaeh said like essentially immediately afterwards, so soon after the conversation.

Q. And do you know if it was in the area where Mr. Dowler and Nevaeh had their conversation or was it in a different location?

A. I believe it was in a different location.

Q. So then after the fight occurred do you have an understanding as to what happened later concerning the investigation?

29

A. Yes.

Q. What's your understanding?

A. So the incident was reported to the Des Moines Police Department I believe the next day. They conducted an investigation through the -- I think the patrol/detective channel of their department.

Q. And that would be the proper mechanism; correct?

A. It's -- It's one of 'em, yes, ma'am.

Q. I mean, you're not critical of that, are you?

A. No.

Q. Okay; and then how about your understanding about the school, did the school also do an investigation?

A. From what I can tell I don't believe so.

Q. You weren't aware -- Oh, you weren't aware of whether the other girls got suspended?

A. I am not aware of that.

Q. If -- If the facts show that the other girls got suspended from school, would that appear to you that the school did an investigation?

A. I would say if they got suspended for that altercation, at some point the school did an

30

investigation. At what point that was I don't -- I don't know.

Q. If the girls testified that they were suspended immediately after, you wouldn't be critical about that, would you?

A. Can you clarify? Can I ask a question on that?

Q. Uh-huh.

A. Can you clarify "immediately"?

Q. The next Monday or Tuesday; I mean, within that week.

A. Sure, I -- I would say that's -- that's sufficient; sure.

Q. I guess what you're saying is if they waited a month or two, you probably -- you might have a concern. Is that what you're saying?

A. I would, yes.

Q. Okay; but if it was done within that week, you would agree that that would be one of the proper means to handle the situation?

A. Well, if we're looking at it from the lens of just investigating the incident, I mean, sometimes these things take time, but if we're talking about conducting an investigation to prevent something from

PApp 52                    Ex. 8

Case 4:20-cv-00109-HCA   Document 36-3   Filed 03/08/21   Page 53 of 54

Mitchell vs. Des Moines Independent Community School District, et al.                                                                Craig Weatherall

31

happening, that's two different deals.

Q. Well, I'm not talking about that 'cause we're talking about this -- just this fight, this assault. So --

A. Okay.

Q. -- the fact that the school suspended the people involved, you would agree that that was probably appropriate action to take.

MR. LIPMAN: I'm going to object right now just for the record that this is not relevant to the issue of failure to protect and negligent supervision. This is post-fight or post-altercation issues that are not the subject of anything in this litigation.

MS. THOMAS: We don't need speaking objections. You can answer, sir.

A. Okay, so I would say that if there was a suspension that resulted from this incident, then it was investigated, so the incident itself happened on a Friday, and I would say a reasonable time period would be to initiate, you know, an investigation probably that following Monday. Depending on -- Depending on how many you have to talk

32

to, I would say this can be concluded within a day or two it would probably be safe to say.

BY MS. THOMAS:

Q. And you're not critical of the fact -- you wouldn't be critical of the fact that the school suspended them, would you?

A. No.

Q. In fact, that would be one of the courses of action that you would recommend happen.

A. I would probably expect that to happen.

Q. Okay. Have you been asked to do anything else as it relates to this case?

A. No.

Q. So have we now talked about the opinions that you hold as it relates to Mr. Dowler?

A. I believe -- I believe we have, yeah.

Q. And in looking at your report -- and correct me if I'm wrong -- the report only focuses on the actions of Mr. Dowler, am I correct, as it relates to the school's involvement?

A. Yes.

Q. And, sir, do you have any knowledge as to whether or not -- or strike that. Let me ask you this: Were you under the

33

understanding that Nevaeh at one time did, in fact, attend Roosevelt?

A. Yes, ma'am.

Q. Do you have an understanding, sir, as to whether or not she had any issues with any of the girls when she was attending Roosevelt or one of the prior schools?

A. It appeared that -- that she knew there was some type of conflict between her and -- is it Mya -- Mya Williams over that. Over that -- that Instagram and friendship over Instagram with that boy.

Q. But that was at the period of time in relationship to this assault; correct?

A. Right. Well, I believe like sometime during the summer before maybe, but, yeah, I mean, roughly around that time.

Q. That's me asking a poor question. We know she attended school the prior year at Roosevelt; correct?

A. Correct.

Q. All right, and you don't see any evidence that there was any issues between any of the girls with Nevaeh the prior year; correct?

A. I -- I think that's correct, yes.

34

MS. THOMAS: All right. Okay. I think that's all I have, sir.

MR. LIPMAN: Officer Weatherall, I just have a couple of questions.

EXAMINATION

BY MR. LIPMAN:

Q. One, if a student visits Valley -- a Valley dance from another school, do you differentiate what school they were from for the purpose of protection and safety?

A. Well, no, I don't. The -- I know that there is a process in which the student from another school can attend the events, but I don't -- I don't -- When there is that many kids coming through, it's almost impossible to differentiate who is -- who is a Valley kiddo and -- and who is from another school.

Q. But you would treat all the students there the same; is that correct?

A. Oh, 100 percent for sure.

Q. Okay; and when someone says, "She doesn't like me" or -- or something to that effect, is it your testimony that the context of that -- of that statement is reported to you?

PApp 53

Ex. 8

Mitchell vs. Des Moines Independent Community School District, et al.

Craig Weatherall

35

A.    I think demeanor, context, environment, absolutely.

MR. LIPMAN:  I have no further questions.

MS. THOMAS:  That's all I have.  Thank you.

THE WITNESS:  Thank you very much.

MR. LIPMAN:  Michele, do you need anything?

THE REPORTER:  Do you want to order this, Janice?

MS. THOMAS:  Yes.

THE REPORTER:  Mr. Lipman?

MR. LIPMAN:  Yes.

(Deposition concluded at 5:20 p.m.)

36

C E R T I F I C A T E

I, the undersigned, a Certified Shorthand Reporter of the State of Iowa, do hereby certify that there came before me at the time, date, and place hereinbefore indicated, the witness named on the caption sheet hereof, who was by me duly sworn to testify to the truth of said witness's knowledge touching and concerning the matters in controversy in this cause; that the witness was thereupon examined under oath, the examination taken down by me in shorthand, and later reduced to Computer-Aided Transcription under my supervision and direction, and that the deposition is a true record of the testimony given and of all objections interposed to the best of my ability.

I further certify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken, and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

Dated at Clarence, Iowa, this 25th day of November, 2020.

_____
CERTIFIED SHORTHAND REPORTER

**PApp 54**

**Ex. 8**